Marvelle J. "Jay" Ballentine
7862 W. Irlo Bronson Memorial Hwy
#82
Kissimmee, FL 34747
(407) 794-6503
jayballentine@protonmail.com
Plaintiff, pro se

**FILED**

SEP  9 2025

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

*AT*
⑤.
*paid*
*no Summ*
*issued*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

MARVELLE J. "JAY" BALLENTINE )
                                )
                   Plaintiff,   )
        vs.                     )
                                )
META PLATFORMS, INC.,           )
and ACCENTURE LLP               )
                                )
                   Defendant(s). )
                                )
                                )
                                )
                                )
                                )
                                )
                                )
                                )
                                )
                                )
                                )
                                )
                                )
                                )

Case No.:

# CV 25 - 7671

**COMPLAINT**

**AGT**

**1) VIOLATION OF 42 U.S.C. § 1981**
(Against Meta Platforms, Inc.)

**2) VIOLATION OF 42 U.S.C. § 1981**
(Against Meta Platforms, Inc., Accenture LLP)

**3) VIOLATION OF 42 U.S.C. § 1982**
(Against Meta Platforms, Inc., Accenture LLP)

**4) VIOLATION OF 42 U.S.C. § 1983**
(Against Meta Platforms, Inc.)

**5) VIOLATION OF 42 U.S.C. § 1985(3)**
(Against Meta Platforms, Inc. and Accenture LLP)

**6) VIOLATION OF CALIFORNIA UNFAIR
COMPETITION LAW - Cal. Bus. & Prof.
Code § 17200 et seq.**
(Against Meta Platforms, Inc. and Accenture LLP)

**JURY TRIAL DEMANDED**

September 7, 2025

Marvelle J. "Jay" Ballentine
Plaintiff, pro se

1

COMPLAINT FOR DECLARATORY AND PUBLIC INJUNCTIVE RELIEF

## I.   INTRODUCTION

1.      This case challenges Meta Platforms, Inc.'s calculated abuse of federal child-protection laws to eliminate Black business owners from Facebook's digital marketplace.

2.      Under the cover of protecting children, a cause no reasonable person would question, Meta and its content-moderation partner Accenture LLP jointly operated an enforcement pipeline that permanently branded innocent Black entrepreneurs as child predators while quietly restoring accounts of white users flagged under the same policy, including one with a confirmed child-sexual-exploitation violation.

3.      The mathematics of this campaign reveal its true purpose. In 2022, Meta made 105.9 million CSE enforcement actions but reported only "over" 26 million to the National Center for Missing and Exploited Children as required by 18 U.S.C. § 2258A. Meta's discretion left nearly 80 million CSE enforcement actions unreported to law enforcement because no actual violations existed to report.

4.      Meta's discriminatory targeting becomes clear through platform-level data: the company concentrated 92.2 million CSE enforcement actions on Facebook's older, established user base versus only 13.7 million on Instagram's younger, objectively higher-risk platform. This alignment with litigation exposure rather than child safety risk reveals the system's true purpose: eliminating users and black business owners who posed legal threats to Meta's operations.

5.      The enforcement surge peaked at 30.1 million actions in Q3 2022 before collapsing 85% by early 2025, creating a strong logical inference of a temporary purge rather than ongoing safety enforcement. Q3 2022 also marked Facebook's CSE reversal peak, with Meta granting 4,000 appeals that quarter alone but only for users it chose to spare.

6.      Plaintiff Marvelle J. "Jay" Ballentine, a Black entrepreneur operating a Meta-approved advertising account for RV repair services, was caught in this discriminatory system. His July 4, 2022 termination came just days after his advertising found market traction, timing that was no coincidence given Q3 2022 marked the highest CSE enforcement quarter in Facebook's history.

COMPLAINT FOR DECLARATORY AND PUBLIC INJUNCTIVE RELIEF

7.     Before making the termination permanent, an Accenture moderator conducting the final human review had full access to Plaintiff's Facebook profile photo and government-issued identification, both plainly depicting a Black man. Plaintiff's ban was affirmed within hours of submitting his passport.

8.     It has been more than three years since Plaintiff's termination, and he has received no follow-up from local, state, or federal law enforcement, indicating that no CyberTip report was ever filed, because no violation existed to report.

9.     Throughout this period, Meta and Accenture terminated then reinstated white business owners, public figures, organization leaders, and one individual with a confirmed CSE violation, while permanently excluding Black business owners who had committed no violations. During 2022 alone, Meta reversed 8,100 CSE enforcement decisions on Facebook through its appeals process but maintained Plaintiff's permanent exclusion despite citing no specific policy violation.

10.    Accenture, earning $500 million annually from this arrangement, processed final enforcement determinations with full knowledge of the disparities. The company had publicly acknowledged that automated models produce "different degrees of wrongness for different people" and over-enforce against historically marginalized users, yet its moderators affirmed permanent bans while staring directly at government IDs displaying users' Black faces.

11.    The false CSE designation carries consequences Meta and Accenture both intended and understood: when attorneys hear those three letters, they refuse representation, precisely the outcome the system was designed to produce.

12.    Meta's false CSE designation on Plaintiff, affirmed in Accenture's final human review process, has accomplished its purpose. Attorneys will not take his case. Plaintiff's business has been destroyed, his commercial property withheld, his access to continuing education severed, and his participation in digital commerce permanently foreclosed. It is against this backdrop that Plaintiff proceeds, pro se.

## II.     JURISDICTION AND VENUE

COMPLAINT FOR DECLARATORY AND PUBLIC INJUNCTIVE RELIEF

13.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3)-(4) (civil rights). Plaintiff's claims arise under 42 U.S.C. §§ 1981, 1982, 1983, and 1985(3).

14.    Venue is proper under 28 U.S.C. § 1391(b)(1)-(2). Meta maintains its principal place of business at 1 Hacker Way, Menlo Park, California 94025, within this District. Accenture conducts substantial business throughout California including maintaining offices in San Francisco.

15.    This Court has jurisdiction to grant declaratory relief under 28 U.S.C. §§ 2201-2202.

## III.    STANDING

16.    Defendants' termination foreclosed Plaintiff's ability to realize any return on his $20,000 investment in RV repair equipment, training, and Meta advertising by eliminating his sole customer acquisition channel. Plaintiff also lost $3,000 in pending transactions and access to the NRVTA Alumni Group required for continuing professional education and technical support.

17.    The Court can redress these injuries through declaratory and injunctive relief.

## IV.    PARTIES

### A. Plaintiff

18.    Plaintiff Marvelle J. "Jay" Ballentine is a Black individual who operated a mobile RV repair business in Florida.

19.    Plaintiff brings this action solely in his individual capacity. He seeks only declaratory and public injunctive relief under 42 U.S.C. §§ 1981, 1982, 1983 and 1985(3). He does not seek compensatory, statutory, punitive, restitutionary, or any other monetary relief. He does not seek to represent, certify, or recover for any class under Rule 23(b)(1), (b)(2), or (b)(3). The structural remedies requested are tailored to redress Plaintiff's own injuries and operate, if at all, incidentally with respect to nonparties.

### B. Defendant

20.    Defendant Meta Platforms, Inc. is a Delaware corporation with its principal place of business at 1 Hacker Way, Menlo Park, California 94025.

21.    Defendant Accenture LLP is a limited liability partnership that operates content moderation services for Meta through facilities in multiple locations, employing approximately

4

5,800 moderators dedicated exclusively to Meta's platforms.

## V. FACTS

### A. PARTIES AND FOUNDATION

22.  Plaintiff Marvelle J. "Jay" Ballentine is a Black business owner who domiciled in Florida and operated his mobile RV repair business in Florida and surrounding states at all times relevant to this action.

23.  Plaintiff created his Facebook account in late 2004 or early 2005 on "TheFacebook.com."

24.  Defendant Meta Platforms, Inc. operates Facebook and Instagram, serving over 3 billion users globally and generating $116.6 billion in revenue in 2022, with 97.5% derived from advertising.

25.  Public reporting indicates Facebook entered into a business arrangement with Accenture around 2012. A 2021 New York Times examination estimated the value of Facebook's contracts with Accenture for moderation and related services at least $500 million per year.

26.  Accenture operates content moderation services for Meta through facilities in Austin, Texas; Dublin, Ireland; Manila, Philippines; and other locations, employing approximately 5,800 moderators dedicated exclusively to Meta's platforms, including work performed from Meta's Fremont (Alameda County) campus through at least January 2023.

27.  Accenture moderators performed final-review on appeals. Meta retained override authority.

### B. CSE PIPELINE—SCALE & REPORTING DISCRETION

28.  In 2022, Meta actioned approximately 105.9 million items under its "Child Sexual Exploitation" (CSE) enforcement category across Facebook and Instagram. Of these, 92.2 million occurred on Facebook and 13.7 million on Instagram.

29.  That same year, Meta submitted approximately 26 million CyberTipline reports to the National Center for Missing and Exploited Children (NCMEC) pursuant to 18 U.S.C. § 2258A. No alternative reporting mechanism exists under federal law.

30.  The difference between the 105.9 million CSE-labeled enforcement actions and the

COMPLAINT FOR DECLARATORY AND PUBLIC INJUNCTIVE RELIEF

approximately 26 million NCMEC reports reflects nearly 80 million CSE-labeled actions that were not referred to NCMEC. Section 2258A leaves "apparent violation" determinations to the provider's discretion.

31.    Meta's public disclosure states: "Electronic Service Providers (ESPs) are legally obligated to report apparent violations of laws related to child sexual abuse material (CSAM) they become aware of to NCMEC's CyberTipline."

32.    Meta's CSE enforcement policy states it removes content that "sexually exploits children." Meta states it "report[s] apparent child exploitation to the National Center for Missing and Exploited Children (NCMEC)."

33.    Section 2258A requires reporting "as soon as reasonably possible after obtaining actual knowledge of any facts or circumstances from which there is an apparent violation" of child exploitation laws. Meta retained discretion over which CSE-labeled enforcement actions resulted in permanent account terminations, which were referred to law enforcement, and which were restored. These decisions occurred after the user's identity, including race, was visible to Meta and its enforcement partners.

34.    Meta's transparency reports show CSE enforcement actions declined from 30.1 million in Q3 2022 to 4.6 million in Q1 2025, a reduction of approximately 85%.

### C. ENFORCEMENT MECHANICS

35.    Meta and Accenture operated a joint moderation pipeline in which Meta set content policies and Accenture staffed human reviewers for final-review of appeals.  Meta retained exclusive control over whether unreported CSE-labeled items were referred to NCMEC under 18 U.S.C. § 2258A.

36.    Accenture billed Meta approximately $50 per hour for each content moderator while paying moderators approximately $18 per hour, creating strong financial dependence on Meta's continued business.

37.    Accenture contractors performing final-review enforcement had access to account-level identifiers, including profile photos, names, and in some cases government-issued ID images, sufficient to reveal a user's race. The permanent ban was affirmed by an Accenture

1  moderator who, during the identity verification process, had full visibility of Plaintiff's Black face
2  through his profile photo and government-issued ID.

3  **D. BIAS KNOWLEDGE**

4  38.    In 2018, Accenture publicly framed algorithmic "fairness" as measuring outcomes
5  "for different people" and acknowledged that automated models can be "wrong" more often for
6  some groups. Its Responsible AI leadership stated there is "no such thing as a perfect algorithm" and
7  warned that models exhibit different error rates "for different people, based on characteristics that
8  should not influence outcomes."

9  39.    In 2019–2020, Meta commissioned and received a Civil Rights Audit that
10  documented "false positive" removals affecting African American users and warned that algorithmic
11  moderation could exacerbate racial inequities. The auditors also noted Meta did not maintain robust
12  protected-class measurement for enforcement, limiting diagnosis of disparate impact.

13  40.    Between 2019 and 2021, Meta conducted 'Project WoW,' surveying 10,000 users and
14  determining that its algorithms were better at detecting hate speech against white people but worse at
15  detecting hate speech against people of color. When Meta researchers proposed corrections to this
16  documented racial bias, Meta Vice President of Global Public Policy Joel Kaplan blocked
17  deployment of the remediation in 2021.

18  41.    Meta's Transparency Center discloses restoration statistics, demonstrating
19  institutional enforcement discretion.

20  **E. PLAINTIFF'S SEQUENCE**

21  42.    Plaintiff, having no prior blue-collar experience, enrolled in the National RV Training
22  Academy specifically because NRVTA certification provided contractual rights to continuing
23  education through the NRVTA Alumni Facebook Group, the sole professional development network
24  providing continuing education and field support essential for competent RV repair services.

25  43.    Plaintiff invested approximately $20,000 in specialized RV repair equipment,
26  training, and Meta advertising, while relying on Facebook's marketing and networking capabilities.

27  44.    At the time of his account termination, Plaintiff sourced 100% of all his clients and
28  leads from RV related Facebook Groups and Facebook advertising. Before termination, Plaintiff had

completed over $2,000 in customer transactions through Facebook-sourced leads and had pending service requests valued at another $3,000. Plaintiff agreed to engage in future customer service contracts with foreknowledge that he would have to rely on continuing education benefits conferred to him by the NRVTA.

45.    In June 2022, Meta reviewed, approved, and published Plaintiff's paid advertisements for his RV repair business and charged his credit card for those services. On July 4, 2022, Meta requested identity verification. Plaintiff submitted his U.S. passport, which displayed the image of a Black man.

46.    Upon information and belief, the Accenture human reviewer deciding Plaintiff's appeal had Plaintiff's government-issued ID and profile photo visible on screen and was authorized to reinstate or affirm the permanent ban. Within hours of receiving Plaintiff's ID, Meta ratified the permanent termination of his account under its "Child Sexual Exploitation" policy without providing any specifics on the alleged violation.

47.    The July 4, 2022 termination eliminated Plaintiff's access to all customer communications, pending appointments, contact information, advertising campaign data, and access to the NRVTA alumni group for continuing education. Plaintiff registered for a new Facebook account in April 2023 in order to access continuing education through the NRVTA Alumni Facebook Group. Meta promptly terminated the new account. No policy violation was cited.

48.    It has been more than three years and Meta has yet to return Plaintiff's business data, and digital property.

## F. MOTIVE, CONTRACT, AND PROPERTY DEPRIVATION

49.    Meta's enforcement systems generated documented false positives across all policy categories. The Civil Rights Audit confirmed these false positives disproportionately affected Black users. On information and belief, each false positive on a business account created potential liability for wrongful termination, contract interference, and discrimination claims.

50.    On June 9, 2022, Plaintiff received his first email from 'Meta for Business,' the rebranded successor to Facebook for Business, marking his first commercial interaction with Meta

since 2017 when he operated under terms requiring court jurisdiction. This renewed engagement subjected Plaintiff to Meta's Commercial Terms containing a 30-day arbitration opt-out clause.

51.     On June 16, 2022, Meta restricted Plaintiff's dormant Meta for Business account, which contained no content, no advertisements, and no transactions, citing 'violations of our Advertising Policies or Community Guidelines.' Meta sent Plaintiff a message indicating the restriction could be lifted if Plaintiff complied with 'increased security requirements for Business Accounts' within five hours. Plaintiff was required to supply and validate his phone number as a precondition for compliance with said increased security requirements. Plaintiff complied.

52.     Plaintiff's first advertisements were approved June 27-30, 2022. Meta terminated his account July 4, 2022, just seven days after the approval of his first RV repair advertisement and before Plaintiff could exercise his contractual right to opt out of arbitration.

53.     ALTERNATIVE PLEADING: Either (a) Meta contends Plaintiff accepted Commercial Terms, but then rendered the 30-day opt-out right meaningless by terminating his account before Plaintiff could exercise his opt-out rights; OR (b) Meta contends no Commercial Terms acceptance occurred by July 4, meaning no advertising arbitration governed the termination.

54.     Plaintiff invested approximately $20,000 in specialized RV repair equipment, training, and Meta advertising, while relying on Facebook's marketing and networking capabilities. At the time of termination, Plaintiff sourced 100% of all his client contacts and leads from RV related Facebook Groups and Facebook advertising. Before termination, Plaintiff had completed over $2,000 in customer transactions through Facebook-sourced leads and had pending service requests valued at another $3,000.

55.     Plaintiff held multiple property interests through Meta's platforms: business communications documenting $3,000 in pending transactions; customer relationships generating 100% of business leads; administrative credentials controlling these assets; advertising campaign data; and access to the NRVTA Alumni Group providing continuing education and field support essential to competent business operations. These interests satisfied all property criteria: precise definition, exclusive control, legitimate exclusivity.

COMPLAINT FOR DECLARATORY AND PUBLIC INJUNCTIVE RELIEF

56.    The termination eliminated Plaintiff's access to all customer communications, pending appointments, contact information, and severed access to the NRVTA Alumni Group, the sole source of continuing education and technical consultation enabling Plaintiff to safely perform repairs.

57.    Meta terminated these property rights July 4, 2022. The termination destroyed stored value. The termination severed commercial relationships. The termination eliminated business operations.  The termination foreclosed on Plaintiff's ability to derive the contractual benefits as conferred to him by the NRVTA.

58.    Meta's deployment of the CSE designation foreclosed review, as its strikes policy allows account disablement after one occurrence for CSE violations. Yet Meta, through its moderation partner Accenture, reversed 8,100 CSE enforcement actions in 2022, including 4,000 during Q3 when Plaintiff's property and contract interests were severed, the most reversals in its documented history. Despite this demonstrated discretion, more than three years have elapsed without Meta returning Plaintiff's business data or restoring his right to make and modify contracts.

### G. COMPARATORS

| Name | Race | Type | Violation | Reinstated |
|------|------|------|-----------|------------|
| Marvelle J. Ballentine | *Black* | *Business Owner* | *None Identified* | *No* |
| Steven Ertelt | *White* | *Organization/Business Page* | *CSE* flag (medical C-section video) | *Yes* |
| COMP-1 | *White* | Individual | *Confirmed CSE* content | *Yes* |
| Abby Covington | White | Individual (Adoption Page) | Human Exploitation | Yes |
| @slut.social | White | Content Creator | Sexual Content/Adult Nudity/Solicitation | Yes |
| Betty Tompkins | White | Artist (Commercial) | Nudity/Sexual Content (artistic) | Yes |

COMPLAINT FOR DECLARATORY AND PUBLIC INJUNCTIVE RELIEF

59. From 2020 to 2025, each entity identified in the matrix was enforced within Meta's sexual-content and Child Sexual Exploitation enforcement family. On information and belief, each matter proceeded through Meta's enforcement apparatus, including vendor-staffed review queues, to human review, including final decisions. Individual accounts displayed race through profile photographs or identity materials. Organizational accounts were white-led entities as reflected in public reporting.

60. In early 2025, Plaintiff discovered that Steven Ertelt's account was flagged under the CSE policy for a medical C-section video. Meta restored Steven Ertelt's account, after receiving a reinstatement demand from his counsel. On April 22, 2025, Plaintiff submitted a formal reinstatement demand to Meta in which Meta constructively denied.

61. COMP-1's case reveals the discretionary nature of Meta's CSE enforcement apparatus. On or around September 3, 2024, Plaintiff discovered a post published to the X Platform (formerly known as Twitter) which showed that on October 17, 2020, COMP-1 posted content that Meta subsequently confirmed constituted a CSE violation.

62. COMP-1 received a temporary suspension and was reinstated after Meta's CSE confirmation. Meta's own review stated: "We confirmed that it does not follow our Community Standards on child sexual exploitation." Yet Meta imposed only a temporary suspension on COMP-1's account. COMP-1's restoration after Meta-confirmed CSE policy violation demonstrates discretion over sanctions and restoration.

63. Meta restored platform access for white comparators despite the cited violations. Each comparator was restored to platform access and contractual status. Meta identified no specific policy violation to Plaintiff. Plaintiff remains permanently excluded from the platform and its commercial infrastructure. Plaintiff's contractual relationship with Meta has not been restored. Plaintiff's access to the contractual rights conferred to him by NRVTA remains severed.

### H. §1983 STATE-ACTION / GOVERNMENTAL NEXUS

64. Electronic communication service providers must report apparent child exploitation violations to the National Center for Missing and Exploited Children upon obtaining actual

knowledge. 18 U.S.C. § 2258A. Meta operates as such a provider. NCMEC operates under congressional charter, 42 U.S.C. § 5773, and serves as the exclusive clearinghouse for these reports.

65.     Section 2258A(g)(3) expressly authorizes NCMEC to forward reports to state and local law enforcement. All fifty states operate Internet Crimes Against Children task forces that receive and investigate these reports. California's ICAC Task Force operates in Meta's home jurisdiction and depends on Meta's reports for case origination.

66.     In 2022, Meta made 105.9 million CSE enforcement actions across its platforms. Meta reported approximately 26 million items to NCMEC that same year. The difference reflects nearly 80 million CSE-labeled actions that Meta did not report to law enforcement.

67.     Meta exercised pure discretion over which CSE-labeled enforcement actions to report to NCMEC, which to withhold from law enforcement, and which resulted in permanent account terminations. These decisions occurred after users' identities, including race, were visible to Meta and its enforcement partners.

68.     Meta's reporting decision determines who faces criminal prosecution. State ICAC units investigate what Meta reports. They cannot investigate what Meta withholds. Report to NCMEC means state investigation follows. No report means no investigation occurs.

69.     Section 2258A(h) mandates one-year evidence preservation after a report. This preservation serves state prosecutions. State investigators access this evidence through NCMEC. Meta controls what evidence is preserved and what is destroyed.

70.     The nearly 80 million unreported CSE flags were not transmitted to state investigators. The 26 million reported flags were transmitted to state investigators. Meta made these determinations unilaterally.

71.     State law enforcement restructured investigations around platform reports. They depend on CyberTipline submissions. Meta's reporting decisions determine which cases enter state criminal systems. Meta performs prosecutorial triage.

72.     Either Meta submitted a CyberTipline report for Plaintiff or it did not. If Meta submitted a report, NCMEC disseminated it to Florida law enforcement under § 2258A(g)(3), triggering state investigative processes and making Meta and state agencies joint actors.

73.     If Meta submitted no report, the CSE designation was pretextual. Meta invoked federal criminal authority to destroy property without reporting any crime. More than three years have passed since July 4, 2022, without law enforcement contact.

74.     First, the deprivation resulted from state-created authority. The statutory scheme under § 2258A makes Meta's reporting decisions determinative of criminal investigations. State agencies depend on Meta's reports. The statutory framework created the deprivation.

75.     Second, Meta acted as a state actor by screening cases for prosecution. State agencies delegated this screening authority through systematic reliance on NCMEC routing. Meta selects which cases enter the prosecutorial pipeline. This is active participation in law enforcement, not mere regulatory compliance.

76.     Meta exercises three powers: determining apparent criminal violations, controlling evidence through mandatory preservation, and initiating state criminal process.

77.     Meta's CSE decisions directly control state criminal justice. They trigger investigations, preserve evidence under § 2258A(h), and determine who faces prosecution. Meta exercises prosecutorial screening power that exceeds content moderation. The state delegated these powers through the statutory framework and systematic reliance on Meta's determinations.

78.     Meta terminated Plaintiff's account July 4, 2022, under its CSE policy after his government ID was viewed, displaying the face of a Black man. During the same period, Meta restored white users flagged under the CSE policy while maintaining Plaintiff's permanent exclusion.

**I. SCIENTER AND AGREEMENT**

79.     In 2018, Accenture publicly acknowledged that automated models produce "different degrees of wrongness for different people." Accenture's Responsible AI leadership stated there is "no such thing as a perfect algorithm" and warned that models exhibit different error rates "for different people, based on characteristics that should not influence outcomes."

80.     Between 2019 and 2020, Meta commissioned and received a Civil Rights Audit that documented "false positive" removals disproportionately affecting African American users. The audit warned that algorithmic moderation could exacerbate racial inequities. The Civil Rights Audit

COMPLAINT FOR DECLARATORY AND PUBLIC INJUNCTIVE RELIEF

further noted that Meta did not maintain robust protected-class measurement for enforcement actions, limiting the company's ability to diagnose disparate impact across racial groups.

81.    Meta's Transparency Center states the company does not offer appeals for violations with "extreme safety concerns, such as child exploitation imagery." Meta's strikes policy provides that accounts "may be disabled after one occurrence" for severe violations including child sexual exploitation.

82.    In 2022, Meta actioned approximately 105.9 million items under its Child Sexual Exploitation enforcement category across Facebook and Instagram. Upon actioning these 105.9 million items, Meta obtained actual knowledge of each flagged item and faced a decision whether to report it to the National Center for Missing and Exploited Children under 18 U.S.C. § 2258A.

83.    Meta reported approximately 26 million items to NCMEC in 2022, and did not report approximately 80 million items that had been actioned under the CSE enforcement category.

84.    Meta reversed 993,400 CSE enforcement actions on Facebook in 2022. Of these reversals, 985,300 occurred without user appeal and 8,100 occurred following appeal through Accenture's review process.

85.    On January 31, 2024, Meta CEO Mark Zuckerberg testified before Congress that Meta reports "all apparent" CSE content to NCMEC. This representation was reiterated in Meta's April 19, 2024 submission to the Senate Judiciary Committee.

86.    Meta's transparency reports show CSE enforcement actions declined from 30.1 million in Q3 2022 to 4.5 million in Q1 2025, a reduction of approximately 85%.

87.    Since 2012, Meta and Accenture have maintained a business arrangement. Public reporting valued this relationship at approximately $500 million for Accenture's performance and delivery of content moderation services in 2021.

88.    Public reporting characterized Accenture as Facebook's single biggest partner in moderating content. The Meta-Accenture relationship constitutes a strategic partnership involving joint development of solutions, shared business development opportunities, and multi-year collaborative planning that "redefined the traditional boundaries of an outsourcing relationship."

89.    Facebook employees directly trained Accenture moderation teams at facilities in Manila, Philippines and Warsaw, Poland, providing instruction on Meta's content policies and review procedures. Accenture dedicated approximately 5,800 moderators exclusively to Meta's platform review queues during the relevant period.

90.    Accenture moderators used Meta-provided content-review tools when conducting enforcement reviews and performing final human review of appeals and edge cases within Meta's enforcement framework. Meta retained override authority over Accenture's enforcement determinations while Accenture exercised operational discretion in conducting final human review of appeals and edge cases.

91.    Accenture's content moderation positions require moderators to exercise 'strong critical thinking and decision-making skills' and to 'investigate, resolve, and relay complex content issues' while applying client guidelines. Accenture moderators conducting final review could view users' government-issued identification displaying racial characteristics when making client guided enforcement decisions.

92.    Accenture moderators reviewing enforcement decisions had immediate access to users' profile photographs displaying racial characteristics before any identity verification request was initiated. When Meta requested government identification from users appealing CSE determinations, Accenture moderators conducting final review could see the face photograph on the submitted identification document.

93.    On July 4, 2022, the following sequence occurred: First, Plaintiff's profile photograph displaying his black face was visible to the enforcement system. Second, Meta requested government-issued identification. Third, Plaintiff submitted his U.S. passport containing his photograph. Fourth, an Accenture moderator viewed Plaintiff's black face as his passport was visible on screen, and affirmed the permanent ban under Meta's Child Sexual Exploitation policy.

## COUNT I
### VIOLATION OF 42 U.S.C. § 1981:  Interference with Right to Make, Enforce, and Modify Advertising Contracts
*(Against Meta Platforms, Inc.)*

94.    Plaintiff incorporates by reference Facts Sections A through G, and I.

95.    Plaintiff is Black and asserts the same right as white citizens to make and enforce contracts under 42 U.S.C. § 1981.

96.    Meta Platforms, Inc. formed and enforced contracts with Plaintiff, including a longstanding account governed by Meta's terms and advertising service agreements that Meta reviewed, approved, and charged between June 27 and June 30, 2022. These contracts provided Plaintiff access to paid advertising services and related business tools.

97.    On July 4, 2022, Meta sent Plaintiff a ban notice stating that his account was permanently disabled for alleged Child Sexual Exploitation content.

98.    Plaintiff immediately attempted an appeal.

99.    Meta conditioned processing of the appeal on submission of government issued identification.

100.    Before any identity verification step, Meta moderators had Plaintiff's profile photograph visible in the account interface. At the decision point during the appeal, Meta's human reviewers had both the profile photograph and the submitted identification visible on screen.

101.    Within hours of Plaintiff's identification submission, Meta upheld the permanent disablement and terminated Plaintiff's advertiser access and business tools.

102.    During the same enforcement window, similarly situated white users flagged under the same policy, including Steven Ertelt and the comparator account identified as COMP-1 in Section G, were restored while Plaintiff remained permanently disabled. Meta acted because of Plaintiff's race.

103.    Meta's termination and refusal to restore concerned the making and enforcing of Plaintiff's advertising contracts with Meta, including formation, performance, modification, termination, enforcement, and the enjoyment of benefits and privileges. The disablement cut off his ability to purchase and run ads and foreclosed his contractual right to modify the agreement by exercising the 30 day arbitration opt out afforded in Meta's Commercial Terms, because Meta terminated within the 30 day arbitration opt out period.

104.    But for Meta's race based decision to uphold the ban during appeal after viewing Plaintiff's identification, Plaintiff would have continued to modify and enjoy the benefits and

COMPLAINT FOR DECLARATORY AND PUBLIC INJUNCTIVE RELIEF

privileges of his advertising contract with Meta. Meta has not restored his access despite Plaintiff's April 22, 2025 reinstatement demand.

105.   The foregoing conduct constitutes race based interference with Plaintiff's right to make, enforce, and modify contracts in violation of 42 U.S.C. § 1981.

## COUNT II
### VIOLATION OF 42 U.S.C. § 1981:   Interference with Right to Make and Enforce Third-Party Contracts
### *(Against Meta Platforms, Inc. and Accenture LLP)*

106.   Plaintiff incorporates by reference Facts Sections A through G, and I.

107.   Plaintiff is Black and asserts the same right as white citizens to make and enforce contracts under 42 U.S.C. § 1981, which right is protected against racially motivated third-party interference.

108.   Before the disablement, Plaintiff sourced 100 percent of his clients and leads from Meta's platforms, had completed more than $2,000 in customer transactions through Facebook sourced leads, and had pending service appointments valued at approximately $3,000.

109.   Plaintiff held a contract with the National RV Training Academy that conferred continuing education and field support benefits through the NRVTA Alumni Facebook Group, which Plaintiff relied upon to competently perform RV repair services.

110.   Meta issued the ban notice, required government identification as a condition of appeal, received Plaintiff's identification, and within hours upheld the ban, severing Plaintiff's access to customer communications, his Facebook sourced sales pipeline, and the NRVTA Alumni Group.

111.   Accenture personnel conducted the final human review of Plaintiff's appeal within Meta's enforcement framework and affirmed the permanent disablement. Meta retained override authority and ratified the outcome. Accenture reviewers had Plaintiff's profile photograph visible before enforcement and had his government identification visible at the decision point during the final review, and exercised discretion to finalize the disablement in absence of any material violation.

17

112.    During the same period, similarly situated white users identified in the Facts were restored while Plaintiff remained disabled. Defendants acted because of Plaintiff's race.

113.    Defendants' sequence of actions created substantial race based impediments to Plaintiff's ability to form, perform, and enforce contracts with existing and prospective customers by blocking him from responding to leads, confirming appointments, performing scheduled work, invoicing, collecting payment, and maintaining client relationships.

114.    Defendants' actions also prevented Plaintiff from accessing the NRVTA Alumni Group and receiving the continuing education benefits for which he had contracted.

115.    But for Meta's race based disablement and refusal to restore, and but for Accenture's final review affirmation at the decision point, Plaintiff would have continued to make new customer contracts, to perform and enforce existing agreements including the pending $3,000 in appointments, and to access his NRVTA contractual benefits.

116.    Defendants' continued withholding of account access and business communications has further prevented Plaintiff from enforcing existing agreements and securing performance or payment from customers with whom he had been communicating at the time of disablement.

117.    The foregoing conduct constitutes third party interference with Plaintiff's right to make and enforce contracts in violation of 42 U.S.C. § 1981.


### COUNT III
**VIOLATION OF 42 U.S.C. § 1982: Interference with Right to Hold and Convey Personal Property**
*(Against Meta Platforms, Inc. and Accenture LLP)*

118.    Plaintiff incorporates by reference Facts Sections A through G, and I.

119.    Plaintiff is Black and asserts under 42 U.S.C. § 1982 the same right as white citizens to hold and convey personal property, which right is protected against racially motivated third-party interference.

120.    Meta Platforms, Inc. permanently disabled Plaintiff's account on July 4, 2022 and has refused restoration, thereby blocking Plaintiff's possession, access, and use of account-resident business property, including customer communications, pending appointments, saved campaigns and

COMPLAINT FOR DECLARATORY AND PUBLIC INJUNCTIVE RELIEF

creative libraries, and administrative credentials controlling these assets, and cutting off Plaintiff's ability to access and use the records, materials, and communications housed in the NRVTA Alumni Group to which he had a right.

121.    Accenture LLP staffed final human review within Meta's enforcement pipeline. On July 4, 2022, an Accenture moderator conducted the initial profile review and final human "appeal" of Plaintiff's case, then affirmed the ban within Meta's framework.

122.    Meta's decisionmakers had Plaintiff's race visible through his profile photograph and government-issued identification; following Plaintiff's account disablement, a similarly situated white Meta for Business account flagged under the same CSE policy—Steven Ertelt—was restored to full platform access and control of account-resident business property, while Plaintiff remained permanently excluded. Meta acted because of Plaintiff's race.

123.    Accenture's final reviewer had Plaintiff's race visible on-screen through both his profile photograph and U.S. passport at the decision point and affirmed the permanent ban within Meta's enforcement framework in the absence of any violation because of Plaintiff's race.

124.    But for Meta's race-based disablement and refusal to restore, Plaintiff would have continued to hold, use, and convey his business property on Meta's platforms.

125.    But for Accenture LLP's race-aware final-review affirmation on July 4, 2022, Meta would not have permanently deprived Plaintiff of his business property.

126.    The disablement and non-restoration deprived Plaintiff of possession and control of his business records, customer lists and receivables, administrative credentials; eliminated access to customer communications and pending appointments valued at $3,000; severed access to the records, materials, and communications housed in the NRVTA Alumni Group; and destroyed goodwill and revenue streams derived from Facebook-sourced customer relationships.

127.    The foregoing conduct constitutes interference with Plaintiff's right to hold and convey property in violation of 42 U.S.C. § 1982.

## COUNT IV
## VIOLATION OF 42 U.S.C. § 1983: Deprivation Of Constitutional Rights Under Color Of State Law
### *(Against Meta Platforms, Inc.)*

128. Plaintiff incorporates by reference Facts Sections A through G and H.

129. Plaintiff is Black and brings this claim under 42 U.S.C. § 1983 for deprivation of rights secured by the Fourteenth Amendment, including Equal Protection, and, in the alternative, Procedural Due Process. Plaintiff alleges Meta acted under color of law as set forth below.

130. On July 4, 2022, Meta permanently disabled Plaintiff's account under its Child Sexual Exploitation (CSE) policy without identifying any specific violating content and has refused restoration, including after Plaintiff's April 22, 2025 reinstatement demand. Meta's CSE lane offers no appeal; nonetheless, Meta routed Plaintiff's case as an "appeal" for internal final human review within its enforcement framework.

131. In connection with the challenged enforcement, Meta exercised discretionary authority inside a child-exploitation reporting and preservation pipeline that includes triage, classification, evidence preservation, and decisions whether to file and transmit CyberTipline reports and user data to NCMEC and/or law enforcement. Plaintiff alleges, in the alternative, that Meta's enforcement is fairly attributable to the State because:

    a. Meta filed or caused to be filed a CyberTipline report concerning Plaintiff and jointly participated with NCMEC and/or law enforcement in the resulting triage; or

    b. Meta acted pursuant to a statutory reporting and preservation regime that compelled and significantly encouraged the challenged conduct; or

    c. Meta's CSE enforcement at the chokepoint is pervasively entwined with law-enforcement-facing functions such that the State is responsible for the decision.

132. Meta's decisionmakers had Plaintiff's race visible through his profile photograph and government-issued identification; during the same enforcement period, similarly situated white users flagged under the same CSE policy, including Steven Ertelt, were restored to full platform access and contractual status while Plaintiff remained permanently excluded. Meta acted because of Plaintiff's race.

133. With respect to procedural due process (if reached), Plaintiff identifies protected interests in access to and use of account-resident business data, customer communications, pending appointments, receipts, audience and advertising assets, and associated contractual relationships.

Meta provided no timely or meaningful notice of specific grounds and no neutral pre or post-deprivation opportunity to be heard before permanently impairing those interests.

134.    But for Meta's race-based exercise of discretionary authority within the reporting/preservation pipeline and its disablement and refusal-to-restore decisions, Plaintiff would not have been deprived of equal protection, and, in the alternative, would not have been deprived of the identified property and contract interests without due process of law.

135.    Plaintiff suffered loss of contract and property interests, economic injury from the elimination of business access and use, and reputational harm associated with the CSE designation.

136.    The foregoing conduct constitutes deprivation of Plaintiff's rights in violation of 42 U.S.C. § 1983.

## COUNT V
### VIOLATION OF 42 U.S.C. § 1985(3): Conspiracy To Deprive Plaintiff Of Civil Rights
*(Against Meta Platforms, Inc. and Accenture LLP)*

137.    Plaintiff incorporates by reference Facts Sections A through G and I.

138.    Plaintiff is Black and asserts a claim under 42 U.S.C. § 1985(3) for a private conspiracy undertaken with class-based, invidiously discriminatory animus to deprive him of equal protection and equal privileges, including the rights secured by 42 U.S.C. §§ 1981 and 1982.

139.    Meta Platforms, Inc. agreed and acted to permanently exclude Plaintiff from its platforms and business tools: on July 4, 2022 Meta imposed a permanent disablement under its Child Sexual Exploitation policy without identifying specific violating content; Meta thereafter refused restoration, including after Plaintiff's April 22, 2025 reinstatement demand. These acts furthered the agreement's objective by preventing Plaintiff from making and enforcing contracts and from holding and using his account-resident business property.

140.    Accenture LLP joined and acted in furtherance of the agreement by staffing final human review within Meta's enforcement pipeline. On July 4, 2022, an Accenture moderator conducted the final human review of Plaintiff's case—routed by Meta as an "appeal"—and affirmed the permanent ban within Meta's framework.

COMPLAINT FOR DECLARATORY AND PUBLIC INJUNCTIVE RELIEF

141.    Meta's decisionmakers had Plaintiff's race visible through his profile photograph and government-issued identification; during the same enforcement period, similarly situated white users flagged under the same CSE policy, including Steven Ertelt, were restored to full platform access and control over account-resident business property while Plaintiff remained permanently excluded. Meta acted with the purpose of depriving Plaintiff, a Black citizen, of equal protection and of the rights secured by §§ 1981 and 1982.

142.    Accenture's final reviewer had Plaintiff's race visible on-screen through both his profile photograph and U.S. passport at the decision point and affirmed the permanent ban within Meta's enforcement framework with the purpose of depriving Plaintiff, a Black citizen, of equal protection and of the rights secured by §§ 1981 and 1982.

143.    But for Meta's agreement and acts in furtherance, including the permanent disablement and refusal to restore, Plaintiff would not have been deprived of equal protection and of the rights secured by §§ 1981 and 1982.

144.    But for Accenture LLP's agreement and discrete act in furtherance—its race-aware initial, and final-review affirmation on July 4, 2022—Meta would not have permanently deprived Plaintiff of his contractual and property rights.

145.    Plaintiff suffered loss of contract and property interests, eliminated access to customer communications and pending appointments, severed access to the NRVTA Alumni Group essential to his business operations, and destroyed goodwill and revenue streams derived from Facebook-sourced customer relationships.

146.    The foregoing conduct constitutes a conspiracy to violate civil rights under 42 U.S.C. § 1985(3).

### COUNT VI
**Cal. Bus. & Prof. Code § 17200 et seq.: Violation Of California Unfair Competition Law**
*(Against Meta Platforms, Inc. and Accenture LLP)*

147.    Plaintiff incorporates by reference Facts Sections A through I.

COMPLAINT FOR DECLARATORY AND PUBLIC INJUNCTIVE RELIEF

148.    Plaintiff is a natural person who suffered injury in fact and lost money or property as a result of Defendants' unfair business acts or practices, including loss of business data, customer communications valued at $3,000, and foreclosed return on $20,000 in business investments.

149.    Meta maintains its principal place of business in Menlo Park, California. Accenture LLP conducted Meta's content moderation services including from Meta's Fremont campus in Alameda County, California.

**A. Unlawful Prong**

150.    Defendants' business acts or practices violate the "unlawful" prong by engaging in conduct that violates 42 U.S.C. §§ 1981, 1982, and 1985(3) as alleged in Counts I, II, III, and V; including operating a discriminatory enforcement pipeline that permanently disabled Black business owners' accounts while restoring similarly situated white users.

**B. Unfair Prong**

151.    Defendants' practices violate the "unfair" prong because they:

    a.  deployed CSE designations against users without reporting 80 million of 105.9 million enforcements to NCMEC;

    b.  permitted final reviewers to view race-identifying materials while making permanent-disablement decisions;

    c.  withheld users' business property after termination; and

    d.  maintained these practices despite documented knowledge of disparate racial impact.

**C. Fraudulent Prong**

152.    Defendants' practices violate the "fraudulent" prong through material misrepresentations likely to deceive reasonable members of the public. Meta and Accenture systematically misrepresent CSE designations as legitimate child safety violations when applying them pretextually to terminate users. On July 4, 2022, Meta falsely told Plaintiff he violated its Child Sexual Exploitation policy without identifying any specific violating content or date of violation, and within hours of Plaintiff submitting his passport displaying his race, an Accenture moderator with both his profile photograph and passport visible on screen affirmed the permanent ban. Upon information and belief, Meta filed no NCMEC report as would be required for actual CSE violations

under 18 U.S.C. § 2258A. This practice deceives users into believing they committed child exploitation offenses when the true reason for termination is discriminatory enforcement. Meta made 105.9 million CSE enforcements in 2022 but reported only "over" 26 million to NCMEC, demonstrating that approximately 75% of CSE designations are pretextual policy labels, not actual violations. Each user receiving a false CSE designation is a member of the public deceived about why their account was terminated. Accenture knowingly participates by affirming these false designations after viewing users' race-identifying materials, despite publicly acknowledging that automated models produce "different degrees of wrongness for different people."

153.    As a direct result, Plaintiff lost money and property. Plaintiff seeks public injunctive relief only under this Count.

## PUBLIC INJUNCTIVE RELIEF UNDER UCL

154.    To remedy the unfair, unlawful, and fraudulent practices and prevent future harm to the general public, Plaintiff requests the Court order:

### Against Meta Platforms, Inc.:

155.    *Public Transparency Dashboard:* Within 120 days, Meta must establish and maintain a publicly accessible dashboard, updated at least quarterly, reporting the following metrics for every content policy category under which Meta permanently disables account access or functionality:

    a.    Total enforcement actions by category and platform

    b.    Total permanent account disablements by category

    c.    Total appeals received and percentage restored by category

    d.    Percentage of human reviews where user-identifying information (profile photos, government IDs, or other identity-revealing materials) was visible to reviewers at decision point

    e.    For any category with statutory reporting obligations (e.g., NCMEC, NCAM, law enforcement), the ratio of enforcements to statutory reports filed

156.    The dashboard must:

    a.    Display all existing enforcement categories without exception

    b.    Include any new categories within 30 days of implementation

24

c.  Maintain a rolling five-year historical view

d.  Provide downloadable raw data in machine-readable format

e.  Include methodology documentation explaining data collection and categorization

157.  *CyberTipline Status Portal:* Establish within 120 days a user-accessible portal where any U.S. user with prior account-administration rights over a disabled account (including individuals administering personal accounts, Page owners, and business account administrators) may request and receive within 30 days:

a.  (a) whether a NCMEC report was filed regarding their account (yes/no);

b.  (b) the date of any such filing.

158.  *Data Export for Permanently Disabled Accounts:* For any account permanently disabled, Meta must provide the individual who held prior account administration rights (including business owners, Page owners, and professional accounts) upon request within 14 days, a machine-readable export of account-resident data the user created or received.

Exceptions to export include:

a.  Communications made by persons over the age of 18 with accounts administered by users under the age of 18

b.  Content depicting, describing, or relating to minors

c.  Content forming the basis of reports to NCMEC, law enforcement, or child-safety organizations

d.  Content under active law enforcement preservation

For excepted content, Meta must provide a log detailing quantity and categories of withheld materials.

159.  *Arbitration Window Status Disclosure:* For any account termination where the user was subject to any agreement containing arbitration provisions, Meta must include in the termination notice:

a.  Whether any such agreement had been triggered and, if so, the triggering event and date

b.  Whether the termination occurred within any applicable arbitration opt-out period

COMPLAINT FOR DECLARATORY AND PUBLIC INJUNCTIVE RELIEF

       c.  The number of days remaining in any opt-out period at the time of termination

**Against Accenture LLP:**

160.   *Final Review Transparency Statement:* Within 60 days, Accenture must publish on Accenture's website a statement describing:

       a.  Accenture's role in Meta's final human review for policy enforcement during 2020-2025;

       b.  Whether reviewers could view users' profile photos and government identification images during review;

       c.  Bias-mitigation training in place during that period

161.   *Quarterly Metrics:* Publish quarterly:

       a.  Total final reviews performed for Meta in safety policy enforcement categories

       b.  Percentage of final reviews in which identity-revealing imagery was displayed

       c.  Comparative affirmation rates when such imagery was visible versus masked

## GENERAL PRAYER FOR RELIEF

WHEREFORE, as to Counts I through V, Plaintiff respectfully requests this Court:

### I. DECLARATORY RELIEF

162.   DECLARE that Meta's and Accenture's operation of a content moderation system that permanently disabled Plaintiff's Meta for Business and Facebook accounts under the Child Sexual Exploitation (CSE) policy while restoring similarly situated white users violated 42 U.S.C. §§ 1981 and 1982.

163.   DECLARE that Accenture LLP, while performing content moderation services as a federal contractor, participated in discriminatory enforcement by affirming Plaintiff's permanent ban while viewing users' race-identifying materials.

164.   DECLARE that no CyberTipline report was filed with NCMEC regarding Plaintiff's July 4, 2022 CSE enforcement action by Meta Platforms, Inc. and Accenture LLP.

165.   DECLARE that Plaintiff owns his account-resident business property and that Defendants' withholding of such property while maintaining disparate restoration practices violates 42 U.S.C. § 1982.

## II. PUBLIC INJUNCTIVE RELIEF

### Orders Against Meta Platforms, Inc.:

166.    *Enhanced Transparency Reporting for CSE Enforcement:* Meta must expand the publicly posted transparency reports to include, for child sexual exploitation enforcement, retroactive to January 1, 2020 and continuing quarterly:

      a.    Account-level enforcement actions disaggregated by race, age bracket, and gender

      b.    NCMEC CyberTipline reports filed, disaggregated by race

      c.    Comparison rates between enforcement actions and CyberTipline reports, and between permanent disablements and CyberTipline reports, by race

Reporting must consist of aggregate, de-identified data only. No CyberTipline contents or user identifiers shall be disclosed. Each report must include a methods appendix explaining data collection and analysis. Meta must update these reports quarterly with a historical backfill to January 1, 2020.

167.    *Identity-Neutral Review for Safety Enforcement:* For safety enforcement including CSE, Meta must implement masking of identity-revealing imagery—including profile photos, avatars, and government identification—by default at every human review stage unless identity verification constitutes the specific task at that step.

A reviewer who has viewed unmasked identity information in any non-identity-verification step cannot serve as the final decision-maker for that account.

168.    *Remedial Notice to CSE-Disabled Account Holders:* Within 120 days, Meta must send a neutral, factual notice to each user with prior account-administration rights over any account permanently disabled under the CSE policy from January 1, 2020 to present. Thereafter, Meta must send such notice within 14 days of any new CSE permanent disablement.

The notice must include:

      a.    Clarification that the CSE enforcement constitutes a platform policy determination rather than a legal finding or criminal accusation

      b.    Disclosure of whether a CyberTipline report was filed for the account and, if filed, the date of filing

    c.   Instructions for requesting a machine-readable export of non-excepted account data and obtaining a manifest of withheld content

    d.   Reference to Meta's enhanced transparency reporting and methodology documentation

169.   *Audit Log Retention:* Meta must maintain for five years audit logs sufficient to show for any human review:

    a.   Timestamp of review

    b.   Reviewer role designation

    c.   Whether identity-revealing imagery was displayed

    d.   Written rationale if masking was lifted

170.   *Bias-Mitigation Training and Public Reporting:* Meta must conduct annual training for reviewers and supervisors on avoiding reliance on protected characteristics. Meta must publish annual public summaries including:

    a.   Training completion rates

    b.   Curriculum overview

    c.   Exception-use rate trends Individual employee information shall not be disclosed.

171.   *Aggregate Disparity Analysis:* Twice yearly for five years from judgment, Meta must publish aggregate summaries of:

    a.   Enforcement outcomes including appeal affirmations versus restorations

    b.   Exception-use rates for identity masking

    c.   Disparities by protected class using existing data and lawful proxies

No party shall be required to collect new sensitive data solely for compliance. Each report must include methodology notes.

**Orders Against Accenture LLP**

172.   *Implementation of Identity-Neutral Review Protocols:* When performing final review or other human review services for Meta's safety enforcement, Accenture must implement identical protocols:

    a.   Masking by default

COMPLAINT FOR DECLARATORY AND PUBLIC INJUNCTIVE RELIEF

   b.  Separation of functions

   c.  Two-key exception system

   d.  Logging and retention requirements as described above

Accenture must bind all partners and subcontractors performing substantially similar functions to these requirements through contractual obligations.

173.  *Reviewer Training and Aggregate Reporting:* Accenture must conduct annual bias-mitigation training for reviewers and supervisors. Accenture must publish annual public summaries showing:

   a.  Training completion rates

   b.  Exception-use rate trends Individual employee information shall not be disclosed.

## VI.  JURY TRIAL DEMANDED

174.  Plaintiff demands a jury trial on all issues so triable.[1]

Dated: September 7, 2025

Respectfully submitted,

MARVELLE J. "JAY" BALLENTINE
Plaintiff, pro se
7862 W. Irlo Bronson Memorial Hwy
#82
Kissimmee, FL 34747
(407) 794-6503
jayballentine@protonmail.com

[1] *As a CSA survivor, Plaintiff gratefully acknowledges the unwavering support of his wife, whose steady presence made the psychological recovery, and subsequent preparation of this Complaint possible. He further acknowledges his children, especially his eldest, who endured his distance during the preparation of this filing after once celebrating his NRVTA graduation with pride. This work now returns to them, just as their father and husband does.*

COMPLAINT FOR DECLARATORY AND PUBLIC INJUNCTIVE RELIEF