1  Marvelle J. "Jay" Ballentine
   7862 W. Irlo Bronson Memorial Hwy
2  #82
   Kissimmee, FL 34747
3  (407) 794-6503
   jayballentine@protonmail.com
4  Plaintiff, pro se

5

6  **IN THE UNITED STATES DISTRICT COURT**
   **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

7

8  MARVELLE J. "JAY" BALLENTINE          )    Case No.: 3:25-cv-07671-CRB
                                         )
9                    Plaintiff,          )
                                         )
10        vs.                            )    **FIRST AMENDED COMPLAINT**
                                         )
11 META PLATFORMS, INC.,                 )
   and ACCENTURE LLP                     )    **1) VIOLATION OF 42 U.S.C. § 1981**
12                                       )     (Against Meta Platforms, Inc.)
                     Defendant(s)        )
13                                       )    **2) VIOLATION OF 42 U.S.C. § 1981**
                                         )    (Against Meta Platforms, Inc., and Accenture LLP)
14                                       )
                                         )    **3) VIOLATION OF 42 U.S.C. § 1982**
15                                       )    (Against Meta Platforms, Inc., and Accenture LLP)
                                         )
16                                       )    **4) VIOLATION OF 42 U.S.C. § 1983**
                                         )    (Against Meta Platforms, Inc. and Accenture LLP)
17                                       )
                                         )    **5) VIOLATION OF 42 U.S.C. § 1985(3)**
18                                       )    (Against Meta Platforms, Inc. and Accenture LLP)
                                         )
19                                       )    **6) VIOLATION OF CALIFORNIA UNFAIR**
                                         )    **COMPETITION LAW - Cal. Bus. & Prof.**
20                                       )    **Code § 17200 et seq.**
                                         )    (Against Meta Platforms, Inc. and Accenture LLP)
21                                       )
                                         )
22                                       )    **JURY TRIAL DEMANDED**
                                         )
23 ──────────────────────────────        )

24

25

26

27

28

---

1

FIRST AMENDED COMPLAINT FOR DECLARATORY AND PUBLIC INJUNCTIVE RELIEF

## I.    INTRODUCTION

1.    This case challenges Meta Platforms, Inc.'s calculated abuse of federal child-protection laws and its baseless CSE ("Child Sexual Exploitation") invocations used to eliminate Black business owners from Facebook's digital marketplace.

2.    Under the cover of protecting children, a cause no reasonable person would question, Meta and its platform policy enforcement partner Accenture LLP jointly operated an enforcement pipeline that permanently branded innocent Black entrepreneurs as child predators while quietly restoring accounts of white users flagged under the same policy, including one with a confirmed child-sexual-exploitation violation.

3.    The mathematics of this campaign reveal its true purpose. In 2022, Meta made 105.9 million CSE enforcement actions but reported only "over" 26 million to the National Center for Missing and Exploited Children as required by 18 U.S.C. § 2258A. Meta reported only ~25% of its CSE enforcement actions to law enforcement in 2022, and left nearly 80 million CSE enforcement actions unreported to law enforcement because no actual violations existed to report.

4.    Meta's discriminatory targeting becomes clear through platform-level data: the company concentrated 92.2 million CSE enforcement actions on Facebook's older, established user base versus only 13.7 million on Instagram's younger, objectively higher-risk platform. This alignment with litigation exposure rather than child safety risk reveals the system's true purpose: eliminating users and Black business owners who posed legal threats to Meta's operations.

5.    The enforcement surge peaked at 30.1 million actions in Q3 2022 before collapsing 85% by early 2025, creating a strong logical inference of a temporary purge rather than ongoing safety enforcement. Q3 2022 also marked Facebook's CSE reversal peak, with Meta deciding reviews in favor of 4,000 users that quarter alone but only for users it chose to spare.

6.    Plaintiff Marvelle J. "Jay" Ballentine, a Black entrepreneur operating a Meta-approved advertising account for RV repair services, was caught in this discriminatory system. His July 4, 2022 termination came just days after his advertising found market traction, timing that was no coincidence given Q3 2022 marked the highest CSE enforcement quarter in Facebook's history.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND PUBLIC INJUNCTIVE RELIEF

7.      Meta issued Plaintiff a baseless CSE invocation and an Accenture reviewer conducting the final human review which affirmed the false invocation had full access to Plaintiff's Facebook profile photo and government-issued identification, both plainly depicting a Black man. Plaintiff's platform elimination was affirmed within hours of submitting his passport.

8.      It has been more than three years since Plaintiff's termination, and he has received no follow-up from local, state, or federal law enforcement as of the date of this filing because Meta did not file a CyberTip report for Plaintiff as required by federal law. No violation existed to report.

9.      Throughout the relevant period, Meta terminated then reinstated white business owners, public figures, organization leaders, and one individual with a confirmed CSE violation, while permanently excluding Black business owners who had committed no violations.

10.      During 2022 alone, Meta reversed 8,100 CSE enforcement decisions on Facebook through its human review process.  However, Meta maintained Plaintiff's permanent exclusion through a baseless invocation of its CSE policy.  Meta maintained Plaintiff's permanent exclusion without reporting Plaintiff to the National Center for Missing and Exploited Children which is their duty under federal law.

11.      Accenture, earning $500 million annually from this arrangement, processed final enforcement determinations with full knowledge of the disparities. The company had publicly acknowledged that automated models produce "different degrees of wrongness for different people" and over-enforce against historically marginalized users, yet its reviewers affirmed *baseless* CSE invocations while staring directly at government IDs displaying users' Black faces.

12.      The baseless CSE invocation carries consequences Meta and Accenture both intended and understood: when attorneys hear those three letters, they refuse representation, precisely the outcome the system was designed to produce. Meta's baseless CSE invocation on Plaintiff, affirmed in Accenture's final human review process, resulted in Meta's desired outcome; Attorneys will not take his case.

13.      Plaintiff's business has been destroyed, his commercial property withheld, his access to continuing education severed, and his participation in digital commerce permanently foreclosed. It

is against this backdrop that Plaintiff proceeds, pro se.

## II.    JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3)-(4) (civil rights). Plaintiff's claims arise under 42 U.S.C. §§ 1981, 1982, 1983, and 1985(3).

15.    Venue is proper under 28 U.S.C. § 1391(b)(1)-(2). Meta maintains its principal place of business at 1 Hacker Way, Menlo Park, California 94025, within this District. Accenture conducts substantial business throughout California including maintaining offices in San Francisco.

16.    This Court has jurisdiction to grant declaratory relief under 28 U.S.C. §§ 2201-2202.

## III.    STANDING

17.    Defendants' termination foreclosed Plaintiff's ability to realize any return on his $20,000 investment in RV repair equipment, training, and Meta advertising by eliminating his sole customer acquisition channel. Plaintiff also lost $3,000 in pending transactions and access to the NRVTA Alumni Group required for continuing professional education and technical support.

18.    The Court can redress these injuries through declaratory and injunctive relief.

## IV.    PARTIES

### A. Plaintiff

19.    Plaintiff Marvelle J. "Jay" Ballentine is a Black individual who operated a mobile RV repair business in Florida.

20.    Plaintiff brings this action solely in his individual capacity. He seeks only declaratory and public injunctive relief under 42 U.S.C. §§ 1981, 1982, 1983 and 1985(3). He does not seek compensatory, statutory, punitive, restitutionary, or any other monetary relief. He does not seek to represent, certify, or recover for any class under Rule 23(b)(1), (b)(2), or (b)(3). The structural remedies requested are tailored to redress Plaintiff's own injuries and operate, if at all, incidentally with respect to nonparties.

### B. Defendant

21.    Defendant Meta Platforms, Inc. is a Delaware corporation with its principal place of business at 1 Hacker Way, Menlo Park, California 94025.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND PUBLIC INJUNCTIVE RELIEF

22.    Defendant Accenture LLP is a limited liability partnership that operates platform policy enforcement services for Meta through facilities in multiple locations, employing approximately 5,800 reviewers dedicated exclusively to Meta's platforms.

**V. FACTS**

**A. PARTIES AND FOUNDATION**

23.    Plaintiff Marvelle J. "Jay" Ballentine is a Black business owner who domiciled in Florida and operated his mobile RV repair business in Florida and surrounding states at all times relevant to this action.

24.    Plaintiff created his Facebook account in late 2004 or early 2005 on "TheFacebook.com."

25.    Defendant Meta Platforms, Inc. operates Facebook and Instagram, serving over 3 billion users globally and generating $116.6 billion in revenue in 2022, with 97.5% derived from advertising.

26.    Public reporting indicates Facebook entered into a business arrangement with Accenture around 2012. A 2021 New York Times examination estimated the value of Facebook's contracts with Accenture for platform policy enforcement services at least $500 million per year.

27.    Accenture operates platform policy enforcement services for Meta through facilities in Austin, Texas; Dublin, Ireland; Manila, Philippines; and other locations, employing approximately 5,800 reviewers dedicated exclusively to Meta's platforms, including work performed from Meta's Fremont (Alameda County) campus through at least January 2023.

28.    Accenture reviewers performed final-review and disposal of cases based on Meta's guidelines. Meta retained override authority.

**B. CSE PIPELINE—SCALE & REPORTING DISCRETION**

29.    In 2022, Meta actioned approximately 105.9 million items under its "Child Sexual Exploitation" (CSE) enforcement category across Facebook and Instagram. Of these, 92.2 million occurred on Facebook and 13.7 million on Instagram.

30.    That same year, Meta submitted approximately 26 million CyberTipline reports to the National Center for Missing and Exploited Children (NCMEC) pursuant to 18 U.S.C. § 2258A. No

alternative reporting mechanism exists under federal law.

31.    The difference between the 105.9 million CSE-labeled enforcement actions and the approximately 26 million NCMEC reports reflects nearly 80 million CSE-labeled actions that were not referred to NCMEC. Section 2258A leaves "apparent violation" determinations to the provider's discretion.

32.    Meta's public disclosure states: "Electronic Service Providers (ESPs) are legally obligated to report apparent violations of laws related to child sexual abuse material (CSAM) they become aware of to NCMEC's CyberTipline."

33.    Meta's CSE enforcement policy states it removes content that "sexually exploits children." Meta states it "report[s] apparent child exploitation to the National Center for Missing and Exploited Children (NCMEC)."

34.    Section 2258A requires reporting "as soon as reasonably possible after obtaining actual knowledge of any facts or circumstances from which there is an apparent violation" of child exploitation laws. Meta retained discretion over which CSE-labeled enforcement actions resulted in permanent account terminations, which were referred to law enforcement, and which were restored. These decisions occurred after the user's identity, including race, was visible to Meta and its enforcement partners.

35.    For the approximately 80 million CSE enforcement actions Meta did *not* report to NCMEC in 2022:

> (a) Meta identified apparent violations of child exploitation laws in these actions but did not report them to NCMEC; or
>
> (b) Meta applied its CSE enforcement category to these actions despite identifying no apparent violations of child exploitation laws.

36.    Meta's transparency reports show CSE enforcement actions declined from 30.1 million in Q3 2022 to 4.6 million in Q1 2025, a reduction of approximately 85%.

## C. ENFORCEMENT MECHANICS

37.    Meta and Accenture operated a joint platform policy enforcement pipeline in which Meta established policy enforcement guidelines while Accenture staffed human reviewers for final

policy enforcement decisions. Within this pipeline, Accenture executed the routing determination at the final step described in ¶40 that decided whether a case proceeded into the CyberTipline reporting workflow under 18 U.S.C. Section § 2258A, or into an alternate workflow. Meta retained override authority.

38.     Accenture billed Meta approximately $50 per hour for each human reviewer while paying them approximately $18 per hour, creating strong financial dependence on Meta's continued business.

39.     Accenture contractors performing final-review enforcement had access to account-level identifiers, including profile photos, names, and in some cases government-issued ID images, sufficient to reveal a user's race. The baseless CSE invocation was affirmed by an Accenture reviewer who, during the identity verification process, had full visibility of Plaintiff's Black face through his profile photo and government-issued ID.

40.     Following affirmation of the baseless CSE invocation, Accenture executed the operational decision that determined whether Plaintiff's case would: (a) enter the NCMEC reporting workflow triggering mandatory law enforcement notification under 18 U.S.C. § 2258A; or (b) bypass law enforcement entirely through an alternative workflow. This routing decision placed Accenture at the chokepoint between platform enforcement and criminal investigation.

**D. BIAS KNOWLEDGE**

41.     In 2018, Accenture publicly framed algorithmic "fairness" as measuring outcomes "for different people" and acknowledged that automated models can be "wrong" more often for some groups. Its Responsible AI leadership stated there is "no such thing as a perfect algorithm" and warned that models exhibit different error rates "for different people, based on characteristics that should not influence outcomes."

42.     In 2019–2020, Meta commissioned and received a Civil Rights Audit that documented "false positive" removals affecting African American users and warned that algorithmic moderation could exacerbate racial inequities. The auditors also noted Meta did not maintain robust protected-class measurement for enforcement, limiting diagnosis of disparate impact.

43.    Between 2019 and 2021, Meta conducted 'Project WoW,' surveying 10,000 users and determining that its algorithms were better at detecting hate speech against white people but worse at detecting hate speech against people of color. When Meta researchers proposed corrections to this documented racial bias, Meta Vice President of Global Public Policy Joel Kaplan blocked deployment of the remediation in 2021.

44.    Meta's Transparency Center discloses restoration statistics, demonstrating institutional policy enforcement discretion.

### E. PLAINTIFF'S SEQUENCE

45.    Plaintiff, having no prior blue-collar experience, enrolled in the National RV Training Academy specifically because NRVTA certification provided contractual rights to continuing education through the NRVTA Alumni Facebook Group, the sole professional development network providing continuing education and field support essential for competent RV repair services.

46.    Plaintiff invested approximately $20,000 in specialized RV repair equipment, training, and Meta advertising, while relying on Facebook's marketing and networking capabilities.

47.    At the time of his account termination, Plaintiff sourced 100% of all his clients and leads from RV related Facebook Groups and Facebook advertising. Before termination, Plaintiff had completed over $2,000 in customer transactions through Facebook-sourced leads and had pending service requests valued at another $3,000. Plaintiff agreed to engage in future customer service contracts with foreknowledge that he would have to rely on continuing education benefits conferred to him by the NRVTA.

48.    In June 2022, Plaintiff began marketing his RV repair business on Facebook and paid to access tools and services delivered through his Facebook for Business account. Meta billed his credit card in accordance with his 'Facebook for Business' account activity between June 27, 2022 to June 30, 2022.

49.    On July 4, 2022, Meta baselessly invoked its CSE policy against Plaintiff and requested identity verification as a precondition to final human review. Plaintiff submitted his U.S. passport, which displayed the image of a Black man.

50.     The Accenture reviewer conducting Plaintiff's review had Plaintiff's government-issued identification and profile photograph visible during review and was authorized to validate or invalidate Meta's invocation of its Child Sexual Exploitation (CSE) policy.

51.     Within hours of receiving Plaintiff's identification, Meta ratified the permanent termination and routed the matter through a workflow that did not result in a report to the National Center for Missing and Exploited Children.

52.     The July 4, 2022 termination eliminated Plaintiff's access to all customer communications, pending appointments, contact information, advertising campaign data, and access to the NRVTA alumni group for continuing education. Plaintiff registered for a new Facebook account in April 2023 in order to access continuing education through the NRVTA Alumni Facebook Group. Meta promptly terminated the new account before Plaintiff could publish any content.

### F.  MOTIVE, CONTRACT, AND PROPERTY DEPRIVATION

53.     Meta's enforcement systems generated documented false positives across all policy categories. The Civil Rights Audit confirmed these false positives disproportionately affected Black users. On information and belief, each false positive on a business account created potential liability for wrongful termination, contract interference, and discrimination claims.

54.     On June 9, 2022, Plaintiff received his first email from 'Meta for Business,' the rebranded successor to Facebook for Business, marking his first commercial interaction with Meta since 2017 when he operated under terms requiring court jurisdiction. This renewed engagement subjected Plaintiff to Meta's Commercial Terms containing a 30-day arbitration opt-out clause.

55.     On June 16, 2022, Meta restricted Plaintiff's dormant Meta for Business account, which contained no content, no advertisements, and no transactions, citing 'violations of our Advertising Policies or Community Guidelines.'  Meta sent Plaintiff a message indicating the restriction could be lifted if Plaintiff complied with 'increased security requirements for Business Accounts' within five hours. Plaintiff was required to supply and validate his phone number as a precondition for compliance with said increased security requirements.  Plaintiff complied.

56.     The contractual relationship between Plaintiff and Meta (Facebook for Business) was consummated between June 27-30, 2022 when Meta billed Plaintiff's credit card for services

delivered. Meta terminated his Facebook and Facebook for Business account on July 4, 2022 before Plaintiff could exercise his contractual right to opt-out of arbitration.

57.    ALTERNATIVE PLEADING: Either (a) Meta contends Plaintiff accepted Commercial Terms, but then rendered the 30-day opt-out right meaningless by terminating his account before Plaintiff could exercise his opt-out rights; OR (b) Meta contends no Commercial Terms acceptance occurred by July 4, meaning no advertising arbitration governed the termination.

58.    Plaintiff invested approximately $20,000 in specialized RV repair equipment, training, and Meta advertising, while relying on Facebook's marketing and networking capabilities. At the time of termination, Plaintiff sourced 100% of all his client contacts and leads from RV related Facebook Groups and Facebook advertising. Before termination, Plaintiff had completed over $2,000 in customer transactions through Facebook-sourced leads and had pending service requests valued at another $3,000.

59.    Plaintiff held multiple property interests through Meta's platforms: business communications documenting $3,000 in pending transactions; customer relationships generating 100% of business leads; administrative credentials controlling these assets; advertising campaign data; and access to the NRVTA Alumni Group providing continuing education and field support essential to competent business operations. These interests satisfied all property criteria: precise definition, exclusive control, legitimate exclusivity.

60.    The termination eliminated Plaintiff's access to all customer communications, pending appointments, contact information, and severed access to the NRVTA Alumni Group, the sole source of continuing education and technical consultation enabling Plaintiff to safely perform repairs.

61.    Meta terminated these property rights July 4, 2022. The termination destroyed stored value. The termination severed commercial relationships. The termination eliminated business operations.  The termination foreclosed on Plaintiff's ability to derive the contractual benefits as conferred to him by the NRVTA.

62.    Meta's deployment of the CSE designation foreclosed review, as its strikes policy allows account disablement after one occurrence for CSE violations. Yet Meta, through its partner

Accenture, reversed 8,100 CSE enforcement actions in 2022, including 4,000 during Q3 when

Plaintiff's property and contract interests were severed, the most reversals in its documented history.

Despite this demonstrated discretion, more than three years have elapsed without Meta returning

Plaintiff's business data or restoring his right to make and modify contracts.

### G. COMPARATORS

| Name | Race | Type | Violation | Reinstated |
|------|------|------|-----------|------------|
| Marvelle J. Ballentine | ***Black*** | *Business Owner* | ***NON-EXISTENT*** | ***No*** |
| Steven Ertelt | ***White*** | *Organization/Business Page* | ***CSE*** flag (medical C-section video) | ***Yes*** |
| COMP-1 | ***White*** | Individual | ***Confirmed CSE*** | ***Yes*** |
| Abby Covington | White | Individual (Adoption Page) | Human Exploitation | Yes |
| @slut.social | White | Content Creator | Sexual Content/Adult Nudity/Solicitation | Yes |
| Betty Tompkins | White | Artist (Commercial) | Nudity/Sexual Content (artistic) | Yes |

63.     From 2020 to 2025, each entity identified in the matrix was enforced within Meta's

sexual-content and Child Sexual Exploitation enforcement family. Each matter proceeded through

Meta's enforcement apparatus, including vendor-staffed review queues, to human review, including

final decisions. Individual accounts displayed race through profile photographs or identity materials.

Organizational accounts were white-led entities as reflected in public reporting.

64.     In early 2025, Plaintiff discovered that Steven Ertelt's account was flagged under the

CSE policy for a medical C-section video. Meta restored Steven Ertelt's account, after receiving a

reinstatement demand from his counsel. On April 22, 2025, Plaintiff submitted a formal

reinstatement demand to Meta in which Meta constructively denied.

65.     COMP-1's case reveals the discretionary nature of Meta's CSE enforcement

apparatus. On or around September 3, 2024, Plaintiff discovered a post published to the X Platform

FIRST AMENDED COMPLAINT FOR DECLARATORY AND PUBLIC INJUNCTIVE RELIEF

(formerly known as Twitter) which showed that on October 17, 2020, COMP-1 posted content that Meta subsequently confirmed constituted a CSE violation.

66. COMP-1 received a temporary suspension and was reinstated after Meta's CSE confirmation. Meta's own review stated: "We confirmed that it does not follow our Community Standards on child sexual exploitation." Yet Meta imposed only a temporary suspension on COMP-1's account. COMP-1's restoration after Meta-confirmed CSE policy violation demonstrates discretion over sanctions and restoration.

67. Meta restored contractual status for the white comparators despite the cited violations. Plaintiff remains permanently excluded from the platform and its commercial infrastructure. Plaintiff's contractual relationship with Meta has not been restored. Plaintiff's access to the contractual rights conferred to him by NRVTA remains severed. Plaintiff's property remains withheld.

## H. §1983 STATE-ACTION / GOVERNMENTAL NEXUS

68. Electronic communication service providers must report apparent child exploitation violations to the National Center for Missing and Exploited Children upon obtaining actual knowledge. 18 U.S.C. § 2258A. Meta operates as such a provider. NCMEC operates under congressional charter, 42 U.S.C. § 5773, and serves as the exclusive clearinghouse for these reports.

69. Section 2258A(g)(3) expressly authorizes NCMEC to forward reports to state and local law enforcement. All fifty states operate Internet Crimes Against Children task forces that receive and investigate these reports. California's ICAC Task Force operates in Meta's home jurisdiction and depends on Meta's reports for case origination.

70. In 2022, Meta made 105.9 million CSE enforcement actions across its platforms. Meta reported approximately 26 million items to NCMEC that same year. The difference reflects nearly 80 million CSE-labeled actions that Meta did not report to law enforcement.

71. Meta exercised pure discretion over which CSE-labeled enforcement actions to report to NCMEC, which to withhold from law enforcement, and which resulted in permanent account terminations. These decisions occurred after users' identities, including race, were visible to Meta and its enforcement partners.

72.     Meta's reporting decision determines who faces criminal prosecution. State ICAC units investigate what Meta reports. They cannot investigate what Meta withholds. Report to NCMEC means state investigation follows. No report means no investigation occurs.

73.     Section 2258A(h) mandates one-year evidence preservation after a report. This preservation serves state prosecutions. State investigators access this evidence through NCMEC. Meta controls what evidence is preserved and what is destroyed.

74.     The nearly 80 million unreported CSE flags were not transmitted to state investigators. The 26 million reported flags were transmitted to state investigators. Defendants made these determinations within Meta's enforcement framework, with Accenture executing the routing described in ¶40 and Meta retaining override authority.

75.     State law enforcement restructured investigations around platform reports. They depend on CyberTipline submissions. Meta's reporting decisions determine which cases enter state criminal systems. Meta performs prosecutorial triage.

76.     Within Meta's enforcement framework, Accenture executed the routing decision that determined which CSE-labeled cases entered the NCMEC reporting workflow and which bypassed law enforcement entirely. This routing function, described in ¶40, placed Accenture at the chokepoint between platform enforcement and state investigation.

77.     Accenture's routing decision determined which users would face state investigation. Cases routed to the NCMEC workflow triggered state law enforcement review. Cases routed to the alternative workflow did not. Meta retained override authority, but Accenture's routing was the operational gateway between platform enforcement and state action.

78.     Either Accenture routed Plaintiff's case to the NCMEC workflow and Meta submitted a CyberTipline report, or Accenture routed the case through the alternative workflow and no report was submitted. If Accenture routed to the NCMEC workflow and Meta submitted a report, NCMEC disseminated it to Florida law enforcement under § 2258A(g)(3), triggering state investigative processes and making Defendants and state agencies joint actors.

79.     Either Defendants reported Plaintiff to NCMEC and triggered state investigation, making them joint actors with state agencies, or they invoked federal criminal authority without

FIRST AMENDED COMPLAINT FOR DECLARATORY AND PUBLIC INJUNCTIVE RELIEF

reporting any crime, making the CSE designation pretextual. More than three years have passed since July 4, 2022 without law enforcement contact, demonstrating no report was filed.

80.    First, the deprivation resulted from state-created authority. The statutory scheme under § 2258A makes Meta's reporting decisions determinative of criminal investigations. State agencies depend on Meta's reports. The statutory framework created the deprivation.

81.    Second, Defendants acted as state actors by screening cases for prosecution. State agencies delegated this screening authority through systematic reliance on NCMEC routing. Accenture's routing decision and Meta's reporting determination jointly select which cases enter the prosecutorial pipeline. This is active participation in law enforcement, not mere regulatory compliance.

82.    Within this framework, Defendants exercise three powers: determining apparent criminal violations (through Accenture's routing and Meta's reporting decisions), controlling evidence through mandatory preservation, and initiating state criminal process.

83.    Defendants' CSE decisions directly control state criminal justice. Accenture's routing decision and Meta's reporting determination trigger investigations, preserve evidence under § 2258A(h), and determine who faces prosecution. Defendants exercise prosecutorial screening power that exceeds platform policy enforcement. The state delegated these powers through the statutory framework and systematic reliance on Defendants' determinations.

84.    Defendants terminated Plaintiff's account July 4, 2022, invoking its CSE policy after his government ID was viewed, displaying the face of a Black man. Accenture's reviewer affirmed the baseless CSE invocation after viewing Plaintiff's identification, while during the same period, Defendants restored white users flagged under the CSE policy but maintained Plaintiff's permanent exclusion.

## I. TOLLING AND CONTINUING VIOLATIONS

85.    In April 2023, Plaintiff attempted to create a new Facebook account to regain access to the NRVTA Alumni Group and related contractual benefits. Meta promptly terminated the new account before Plaintiff could publish any content.

86. Meta invoked its CSE policy upon Plaintiff and did not disclose that white users subject to the same enforcement pipeline had their contractual status with Meta restored.

87. On September 3, 2024, Plaintiff discovered that "COMP-1," a white user whose content Meta confirmed violated its Community Standards on child sexual exploitation, had their contractual status with Meta restored. This was Plaintiff's first indication that white users subject to the same CSE policy enforcement pipeline received different enforcement review outcomes.

88. In January 2025, Plaintiff discovered that Meta reinstated Steven Ertelt, a white user whose account was subject to Meta's CSE policy enforcement pipeline, following a reinstatement demand from his counsel. These comparator reinstatements were not previously disclosed to Plaintiff and became known to him no later than January 2025.

89. On April 22, 2025, Plaintiff sent Meta a written reinstatement demand; on April 24, 2025, he sent a litigation hold notice. Meta constructively denied the restoration of Plaintiff's right to make and modify contracts, and did not assert any defense for its baseless invocation of its CSE policy against Plaintiff.

90. Plaintiff remains unable to access his account-resident business data, property, pending customer communications, and the NRVTA Alumni Group, and Meta has not returned those materials. These conditions have continued from July 2022 through the filing of this action.

91. The facts in ¶¶85–90 describe (a) discrete, post-2022 events—including Plaintiff's April 2023 re-registration attempt, the September 2024 and January 2025 discovery of white comparator reinstatements, and Plaintiff's April 2025 reinstatement demand with no restoration—and (b) the present application of the CSE invocation and related blocking mechanisms to Plaintiff.

92. These allegations are pleaded to establish the dates on which Plaintiff learned of materially different enforcement outcomes, the dates on which he requested reinstatement, and the ongoing maintenance of the disablement and withholding of account-resident property.

**J. SCIENTER AND AGREEMENT**

93. In 2018, Accenture publicly acknowledged that automated models produce "different degrees of wrongness for different people." Accenture's Responsible AI leadership stated there is "no

such thing as a perfect algorithm" and warned that models exhibit different error rates "for different people, based on characteristics that should not influence outcomes."

94.    Between 2019 and 2020, Meta commissioned and received a Civil Rights Audit that documented "false positive" removals disproportionately affecting African American users. The audit warned that algorithmic moderation could exacerbate racial inequities. The Civil Rights Audit further noted that Meta did not maintain robust protected-class measurement for enforcement actions, limiting the company's ability to diagnose disparate impact across racial groups.

95.    Meta's Transparency Center states the company does not offer appeals for violations with "extreme safety concerns, such as child exploitation imagery." Meta's strikes policy provides that accounts "may be disabled after one occurrence" for severe violations including child sexual exploitation.

96.    In 2022, Meta actioned approximately 105.9 million items under its Child Sexual Exploitation enforcement category across Facebook and Instagram.

97.    Upon actioning these 105.9 million items, Meta obtained actual knowledge of each flagged item and faced a decision whether to report it to the National Center for Missing and Exploited Children under 18 U.S.C. § 2258A. Meta chose not to report Plaintiff to the National Center for Missing and Exploited Children.

98.    Meta reported approximately 26 million items to NCMEC in 2022, and did not report approximately 80 million items that had been actioned under the CSE enforcement category.

99.    Meta reversed 993,400 CSE enforcement actions on Facebook in 2022. Of these reversals, 985,300 occurred without user initiated reviews and 8,100 occurred following final human review through the Defendants' joint policy enforcement framework.

100.    Meta reported approximately 25% of its CSE enforcement actions to NCMEC in 2022. On January 31, 2024, Meta CEO Mark Zuckerberg testified before Congress that Meta reports "all apparent" CSE content to NCMEC. This representation was reiterated in Meta's April 19, 2024 submission to the Senate Judiciary Committee.

101.    Meta's transparency reports show CSE enforcement actions declined from 30.1 million in Q3 2022 to 4.6 million in Q1 2025, a reduction of approximately 85%.

102.    Since 2012, Meta and Accenture have maintained a business arrangement. Public reporting valued this relationship at approximately $500 million for Accenture's performance and delivery of platform policy enforcement services in 2021.

103.    Public reporting characterized Accenture as Facebook's single biggest partner in platform enforcement. The Meta-Accenture relationship constitutes a strategic partnership involving joint development of solutions, shared business development opportunities, and multi-year collaborative planning that "redefined the traditional boundaries of an outsourcing relationship."

104.    Facebook employees directly trained Accenture reviewer teams at facilities in Manila, Philippines and Warsaw, Poland, providing instruction on Meta's policies and review procedures. Accenture dedicated approximately 5,800 reviewers exclusively to Meta's platform review queues during the relevant period.

105.    Accenture reviewers used Meta-provided account-review tools when conducting enforcement reviews within Meta's enforcement framework. Meta retained authority over Accenture's policy enforcement determinations while Accenture exercised operational discretion in conducting final human review of platform policy violations and edge cases.

106.    Accenture's platform policy enforcement positions require reviewers to exercise 'strong critical thinking and decision-making skills' in investigating, resolving, and relaying complex enforcement issues while applying client guidelines. Accenture reviewers conducting final review could view users' government-issued identification displaying racial characteristics when making client guided enforcement decisions.

107.    Accenture reviewers reviewing enforcement decisions had immediate access to users' profile photographs displaying racial characteristics before any identity verification request was initiated. When Meta requested government identification from users requesting review of CSE determinations, Accenture reviewers conducting final review could see the face photograph on the submitted identification document.

108.    On July 4, 2022, the following sequence occurred: First, Plaintiff's profile photograph displaying his Black face was visible to the enforcement system. Second, Meta requested government-issued identification. Third, Plaintiff submitted his U.S. passport containing his

photograph. Fourth, an Accenture reviewer viewed Plaintiff's Black face as his passport was visible on screen, and affirmed the baseless invocation of Meta's Child Sexual Exploitation policy.

## COUNT I
### VIOLATION OF 42 U.S.C. § 1981:  Interference with Right to Make, Enforce, and Modify Advertising Contracts
*(Against Meta Platforms, Inc.)*

109.    Plaintiff incorporates by reference Facts Sections A through G, I, and J.

110.    Plaintiff is Black and asserts the same right as white citizens to make and enforce contracts under 42 U.S.C. § 1981.

111.    Meta Platforms, Inc. formed and enforced contracts with Plaintiff, including a longstanding account governed by Meta's terms and commercial service agreements which were consummated when Meta charged for, and delivered Meta for Business services between June 27 and June 30, 2022. These contracts provided Plaintiff access to paid advertising services and related business tools.

112.    On July 4, 2022, Meta sent Plaintiff a notice that it was severing Plaintiff's access to his Meta for Business and Facebook account via an entirely baseless invocation of its Child Sexual Exploitation (CSE) policy.

113.    Plaintiff immediately requested a review.

114.    Meta conditioned processing of the review on submission of government issued identification.

115.    Before any identity verification step, Meta reviewers had Plaintiff's profile photograph visible in the account interface. At the decision point during the review, Meta's human reviewers had both the profile photograph and the submitted identification visible on screen.

116.    Within hours of Plaintiff's identification submission, Meta upheld the permanent disablement and terminated Plaintiff's advertiser access and business tools.

117.    During the same enforcement window, similarly situated white users flagged under the same policy, including Steven Ertelt and the comparator account identified as COMP-1 in Section G, were restored while Plaintiff remained permanently disabled. Meta acted because of Plaintiff's race.

118.    Meta's termination and refusal to restore concerned the making and enforcing of Plaintiff's advertising contracts with Meta, including formation, performance, modification, termination, enforcement, and the enjoyment of benefits and privileges. The disablement cut off his ability to purchase and run ads and foreclosed his contractual right to modify the agreement by exercising the 30 day arbitration opt out afforded in Meta's Commercial Terms, because Meta terminated within the 30 day arbitration opt out period.

119.    But for Meta's race-based decision to uphold the permanent termination during review after viewing Plaintiff's identification, Plaintiff would have continued to modify and enjoy the benefits and privileges of his advertising contract with Meta. Meta has not restored his access despite Plaintiff's April 22, 2025 reinstatement demand.

120.    The foregoing conduct constitutes race based interference with Plaintiff's right to make, enforce, and modify contracts in violation of 42 U.S.C. § 1981.

## COUNT II
### VIOLATION OF 42 U.S.C. § 1981:  Interference with Right to Make and Enforce Third-Party Contracts
### *(Against Meta Platforms, Inc. and Accenture LLP)*

121.    Plaintiff incorporates by reference Facts Sections A through G, I, and J.

122.    Plaintiff is Black and asserts the same right as white citizens to make and enforce contracts under 42 U.S.C. § 1981, which right is protected against racially motivated third-party interference.

123.    Before the disablement, Plaintiff sourced 100 percent of his clients and leads from Meta's platforms, had completed more than $2,000 in customer transactions through Facebook sourced leads, and had pending service appointments valued at approximately $3,000.

124.    Plaintiff held a contract with the National RV Training Academy that conferred continuing education and field support benefits through the NRVTA Alumni Facebook Group, which Plaintiff relied upon to competently perform RV repair services.

125.    Meta delivered Plaintiff notice of its CSE invocation upon Plaintiff's account and required government identification as precondition to final human review. Meta received Plaintiff's

FIRST AMENDED COMPLAINT FOR DECLARATORY AND PUBLIC INJUNCTIVE RELIEF

identification, and within hours ratified the invocation and severed Plaintiff's access to customer communications, his Facebook sourced sales pipeline, and the NRVTA Alumni Group.

126. Accenture personnel conducted the final human review of Plaintiff's case within Meta's enforcement framework and affirmed the CSE invocation. Meta ratified the final outcome. Accenture reviewers had Plaintiff's profile photograph visible before enforcement and had his government identification visible at the decision point during the final review, and exercised discretion to affirm the CSE invocation in the absence of any specific grounds.

127. During the same period, similarly situated white users identified in the Facts were restored while Plaintiff's ability to make and modify contracts remained severed. Defendants acted because of Plaintiff's race.

128. Defendants' sequence of actions created substantial race based impediments to Plaintiff's ability to form, perform, and enforce contracts with existing and prospective customers by blocking him from responding to leads, confirming appointments, performing scheduled work, invoicing, collecting payment, and maintaining client relationships.

129. Defendants' actions also prevented Plaintiff from accessing the NRVTA Alumni Group and receiving the continuing education benefits for which he had contracted.

130. But for Meta's race based disablement and refusal to restore, and but for Accenture's final review affirmation at the decision point, Plaintiff would have continued to make new customer contracts, to perform and enforce existing agreements including the pending $3,000 in appointments, and to access his NRVTA contractual benefits.

131. Defendants' continued withholding of account access and business communications has further prevented Plaintiff from enforcing existing agreements and securing performance or payment from customers with whom he had been communicating at the time of disablement.

132. The foregoing conduct constitutes third party interference with Plaintiff's right to make and enforce contracts in violation of 42 U.S.C. § 1981.

### COUNT III
**VIOLATION OF 42 U.S.C. § 1982: Interference with Right to Hold and Convey Personal Property**
*(Against Meta Platforms, Inc. and Accenture LLP)*

133.    Plaintiff incorporates by reference Facts Sections A through G, I, and J.

134.    Plaintiff is Black and asserts under 42 U.S.C. § 1982 the same right as white citizens to hold and convey personal property, which right is protected against racially motivated third-party interference.

135.    Meta Platforms, Inc. permanently disabled Plaintiff's account on July 4, 2022 and has refused restoration, thereby blocking Plaintiff's possession, access, and use of account-resident business property, including customer communications, pending appointments, saved campaigns and creative libraries, and administrative credentials controlling these assets, and cutting off Plaintiff's ability to access and use the records, materials, and communications housed in the NRVTA Alumni Group to which he had a right.

136.    Accenture LLP staffed final human review within Meta's enforcement pipeline. On July 4, 2022, an Accenture reviewer conducted the initial profile review and final human review of Plaintiff's case, then affirmed the CSE invocation within Meta's framework.

137.    Meta's decisionmakers had Plaintiff's race visible through his profile photograph and government-issued identification; following Plaintiff's account disablement, a similarly situated white Meta for Business account flagged under the same CSE policy—Steven Ertelt—was restored to full platform access and control of account-resident business property, while Plaintiff remained permanently excluded. Meta acted because of Plaintiff's race.

138.    Accenture's final reviewer had Plaintiff's race visible on-screen through both his profile photograph and U.S. passport at the decision point and affirmed the CSE invocation within Meta's enforcement framework without any identifying grounds because of Plaintiff's race.

139.    But for Meta's race-based disablement and refusal to restore, Plaintiff would have continued to hold, use, and convey his business property on Meta's platforms.

140.    But for Accenture LLP's race-aware final-review affirmation on July 4, 2022, Meta would not have permanently deprived Plaintiff of his business property.

141.    The disablement and non-restoration deprived Plaintiff of possession and control of his business records, customer lists and receivables, administrative credentials; eliminated access to customer communications and pending appointments valued at $3,000; severed access to the

records, materials, and communications housed in the NRVTA Alumni Group; and destroyed

goodwill and revenue streams derived from Facebook-sourced customer relationships.

142.    The foregoing conduct constitutes interference with Plaintiff's right to hold and

convey property in violation of 42 U.S.C. § 1982.

**COUNT IV**

**VIOLATION OF 42 U.S.C. § 1983: Deprivation Of Constitutional Rights Under Color Of State Law**

*(Against Meta Platforms, Inc. and Accenture LLP)*

143.    Plaintiff incorporates by reference Facts Sections A through I.

144.    Plaintiff is Black and brings this claim under 42 U.S.C. § 1983 for deprivation of

rights secured by the Fourteenth Amendment, including Equal Protection, and, in the alternative,

Procedural Due Process. Plaintiff alleges Meta and Accenture acted under color of law as set forth

below.

145.    On July 4, 2022, Defendants permanently disabled Plaintiff's account invoking Meta's

CSE policy without identifying any specific grounds and have refused reinstatement, including after

Plaintiff's April 22, 2025 reinstatement demand. Meta's CSE lane offers no opportunity for account

restoration; nonetheless, Defendants routed Plaintiff's case for internal final human review within the

joint enforcement framework.

146.    In connection with the challenged enforcement, Meta and Accenture exercised

discretionary authority inside a child-exploitation reporting and preservation pipeline that includes

triage, classification, evidence preservation, and routing decisions whether to file and transmit

CyberTipline reports and user data to NCMEC and law enforcement. Accenture's routing decision

determined which cases entered the NCMEC reporting workflow and Meta's reporting decision

determined whether CyberTipline reports were filed. Plaintiff alleges, in the alternative, that

Defendants' enforcement is fairly attributable to the state because:

      a.    Accenture routed Plaintiff's case to the NCMEC workflow, Meta filed or caused to be

            filed a CyberTipline report concerning Plaintiff, and Defendants jointly participated

            with NCMEC and law enforcement in the resulting triage; or

b.  Defendants acted pursuant to a statutory reporting and preservation regime that compelled and significantly encouraged the challenged conduct; or

c.  Defendants' CSE enforcement and the routing function at the chokepoint described in ¶40 are pervasively entwined with law-enforcement-facing functions such that the state is responsible for the decision.

147.  Meta's decisionmakers and Accenture's reviewer had Plaintiff's race visible through his profile photograph and government-issued identification; during the same enforcement period, similarly situated white users flagged under the same CSE policy, including Steven Ertelt, were restored to full platform access and contractual status while Plaintiff remained permanently excluded. Defendants acted because of Plaintiff's race.

148.  With respect to procedural due process (if reached), Plaintiff identifies protected interests in access to and use of account-resident business data, customer communications, pending appointments, receipts, audience and advertising assets, and associated contractual relationships. Defendants provided no timely or meaningful notice of specific grounds and no neutral pre- or post-deprivation opportunity to be heard before permanently impairing those interests.

149.  But for Defendants' race-based exercise of discretionary authority within the reporting and preservation pipeline, including Accenture's routing decision and Meta's reporting decision, and their disablement and refusal-to-restore decisions, Plaintiff would not have been deprived of equal protection, and, in the alternative, would not have been deprived of the identified property and contract interests without due process of law.

150.  Plaintiff suffered loss of contract and property interests, economic injury from the elimination of business access and use, and reputational harm associated with the CSE designation.

151.  The foregoing conduct by Meta Platforms, Inc. and Accenture LLP, acting under color of state law, constitutes deprivation of Plaintiff's rights in violation of 42 U.S.C. § 1983.

### COUNT V
**VIOLATION OF 42 U.S.C. § 1985(3): Conspiracy To Deprive Plaintiff Of Civil Rights**
*(Against Meta Platforms, Inc. and Accenture LLP)*

152.  Plaintiff incorporates by reference Facts Sections A through G, I, and J.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND PUBLIC INJUNCTIVE RELIEF

153.    Plaintiff is Black and asserts a claim under 42 U.S.C. § 1985(3) for a private conspiracy undertaken with class-based, invidiously discriminatory animus to deprive him of equal protection and equal privileges, including the rights secured by 42 U.S.C. §§ 1981 and 1982.

154.    Meta Platforms, Inc. agreed and acted to permanently exclude Plaintiff from its platforms and business tools: on July 4, 2022 Meta imposed a permanent severance after invoking its Child Sexual Exploitation policy without identifying any specific grounds; Meta thereafter refused reinstatement, including after Plaintiff's April 22, 2025 reinstatement demand. These acts furthered the agreement's objective by preventing Plaintiff from making and enforcing contracts and from holding and using his account-resident business property.

155.    Accenture LLP joined and acted in furtherance of the agreement by staffing final human review within Meta's enforcement pipeline. On July 4, 2022, Meta routed Plaintiff's case to Accenture for final human review. The review was conducted in adherence to Meta's policy enforcement guidelines. The Accenture reviewer affirmed the CSE invocation which resulted in a permanent severance within Meta's policy enforcement framework.

156.    Meta's decisionmakers had Plaintiff's race visible through his profile photograph and government-issued identification; during the same enforcement period, similarly situated white users flagged under the same CSE policy, including Steven Ertelt, were restored to full platform access and control over account-resident business property while Plaintiff remained permanently excluded. Meta acted with the purpose of depriving Plaintiff, a Black citizen, of equal protection and of the rights secured by §§ 1981 and 1982.

157.    Accenture's final reviewer had Plaintiff's race visible on-screen through both his profile photograph and U.S. passport at the decision point and affirmed the CSE invocation within Meta's enforcement framework with the purpose of depriving Plaintiff, a Black citizen, of equal protection and of the rights secured by §§ 1981 and 1982.

158.    But for Meta's agreement and acts in furtherance, including the permanent disablement and refusal to restore, Plaintiff would not have been deprived of equal protection and of the rights secured by §§ 1981 and 1982.

159.    But for Accenture LLP's agreement and discrete act in furtherance—its race-aware initial, and final-review affirmation of the baseless CSE invocation on July 4, 2022—Meta would not have permanently deprived Plaintiff of his contractual and property rights.

160.    Plaintiff suffered loss of contract and property interests, eliminated access to customer communications and pending appointments, severed access to the NRVTA Alumni Group essential to his business operations, and destroyed goodwill and revenue streams derived from Facebook-sourced customer relationships.

161.    The foregoing conduct constitutes a conspiracy to violate civil rights under 42 U.S.C. § 1985(3).

## COUNT VI
**Cal. Bus. & Prof. Code § 17200 et seq.: Violation Of California Unfair Competition Law**
*(Against Meta Platforms, Inc. and Accenture LLP)*

162.    Plaintiff incorporates by reference Facts Sections A through J.

163.    Plaintiff is a natural person who suffered injury in fact and lost money or property as a result of Defendants' unfair business acts or practices, including loss of business data, customer communications valued at $3,000, and foreclosed return on $20,000 in business investments.

164.    Meta maintains its principal place of business in Menlo Park, California. Accenture LLP conducted Meta's platform policy enforcement services including from Meta's Fremont campus in Alameda County, California.

**A. Unlawful Prong**

165.    Defendants' business acts or practices violate the "unlawful" prong by engaging in conduct that violates 42 U.S.C. §§ 1981, 1982, and 1985(3) as alleged in Counts I, II, III, and V, including operating a discriminatory enforcement pipeline that permanently disabled Black business owners' accounts while restoring similarly situated white users.

**B. Unfair Prong**

166.    Defendants' practices violate the "unfair" prong because they:

   a.    deployed CSE designations against users without reporting 80 million of 105.9 million enforcements to NCMEC;

FIRST AMENDED COMPLAINT FOR DECLARATORY AND PUBLIC INJUNCTIVE RELIEF

b.   permitted final reviewers to view race-identifying materials while making permanent-disablement decisions;

c.   withheld users' business property after termination; and

d.   maintained these practices despite documented knowledge of disparate racial impact.

**C. Fraudulent Prong**

167.    Defendants' practices violate the "fraudulent" prong through material misrepresentations likely to deceive reasonable members of the public. Meta and Accenture systematically misrepresent CSE invocations as legitimate child safety violations when applying them pretextually to terminate users. On July 4, 2022, Meta falsely invoked its CSE policy against Plaintiff without identifying any specific grounds, and within hours of Plaintiff submitting his passport displaying his race, an Accenture reviewer with both his profile photograph and passport visible on screen affirmed the CSE invocation. Meta filed no NCMEC report as would be required for actual CSE violations under 18 U.S.C. § 2258A. This practice deceives users into believing they committed child exploitation offenses when the true reason for termination is discriminatory enforcement. Meta made 105.9 million CSE enforcements in 2022 but reported only "over" 26 million to NCMEC, demonstrating that approximately 75% of CSE designations are pretextual policy labels, not actual violations. Each user receiving a false CSE designation is a member of the public deceived about why their account was terminated. Accenture knowingly participates by affirming these false designations after viewing users' race-identifying materials, despite publicly acknowledging that automated models produce "different degrees of wrongness for different people."

168.    Plaintiff initially relied on the baseless CSE invocation, paused business and legal outreach, and thereby lost money and property. Plaintiff seeks public injunctive relief only under this Count.

**PUBLIC INJUNCTIVE RELIEF UNDER UCL**

169.    To remedy the unfair, unlawful, and fraudulent practices and prevent future harm to the general public, Plaintiff requests the Court order:

**Against Meta Platforms, Inc.:**

170.    *Public Transparency Dashboard:* Within 120 days, Meta must establish and maintain a publicly accessible dashboard, updated at least quarterly, reporting the following metrics for every enforcement policy category under which Meta permanently disables account access or functionality:

    a.   Total enforcement actions by category and platform

    b.   Total permanent account disablements by category

    c.   Total requests for review received and percentage restored by category

    d.   Percentage of human reviews where user-identifying information (profile photos, government IDs, or other identity-revealing materials) was visible to reviewers at decision point

    e.   For any category with statutory reporting obligations, the ratio of enforcements to statutory reports filed

171.    The dashboard must:

    a.   Display all existing enforcement categories without exception

    b.   Include any new categories within 30 days of implementation

    c.   Maintain a rolling five-year historical view

    d.   Provide downloadable raw data in machine-readable format

    e.   Include methodology documentation explaining data collection and categorization

172.    *CyberTipline Status Portal:* Establish within 120 days a user-accessible portal where any U.S. user with prior account-administration rights over a disabled account (including individuals administering personal accounts, Page owners, and business account administrators) may request and receive within 30 days:

    a.   (a) whether a NCMEC report was filed regarding their account (yes/no);

    b.   (b) the date of any such filing.

173.    *Data Export for Permanently Disabled Accounts:* For any account permanently disabled, Meta must provide the individual who held prior account administration rights (including business owners, Page owners, and professional accounts) upon request within 14 days, a

FIRST AMENDED COMPLAINT FOR DECLARATORY AND PUBLIC INJUNCTIVE RELIEF

machine-readable export of account-resident data the user created or received.

Exceptions to export include:

    a. Communications made by persons over the age of 18 with accounts administered by users under the age of 18

    b. Content depicting, describing, or relating to minors

    c. Content forming the basis of reports to NCMEC, law enforcement, or child-safety organizations

    d. Content under active law enforcement preservation

    For excepted content, Meta must provide a log detailing quantity and categories of withheld materials.

174. *Arbitration Window Status Disclosure:* For any account termination where the user was subject to any agreement containing arbitration provisions, Meta must include in the termination notice:

    a. Whether any such agreement had been triggered and, if so, the triggering event and date

    b. Whether the termination occurred within any applicable arbitration opt-out period

    c. The number of days remaining in any opt-out period at the time of termination

**Against Accenture LLP:**

*Vendor Accountability Disclosure:* Accenture must disclose annually the number of Meta account holders who contacted Accenture directly seeking review or explanation of permanent exclusion decisions, and the number of such requests Accenture referred back to Meta without independent review.

## **GENERAL PRAYER FOR RELIEF**

WHEREFORE, as to Counts I through V, Plaintiff respectfully requests this Court:

### **I. DECLARATORY RELIEF**

175. DECLARE that Meta's and Accenture's operation of a platform policy enforcement system that permanently disabled Plaintiff's Meta for Business and Facebook accounts under the

Child Sexual Exploitation (CSE) policy while restoring similarly situated white users violated 42 U.S.C. §§ 1981 and 1982.

176.    DECLARE that Accenture LLP, while performing platform policy enforcement services as a federal contractor, participated in discriminatory enforcement by affirming Plaintiff's false CSE invocation while viewing users' race-identifying materials.

177.    DECLARE that no CyberTipline report was filed with NCMEC regarding Plaintiff's July 4, 2022 CSE enforcement action by Meta Platforms, Inc. and Accenture LLP.

178.    DECLARE that Plaintiff owns his account-resident business property and that Defendants' withholding of such property while maintaining disparate restoration practices violates 42 U.S.C. § 1982.

## II. PUBLIC INJUNCTIVE RELIEF

### Orders Against Meta Platforms, Inc.:

179.    *Enhanced Transparency Reporting for CSE Enforcement:* Meta must expand the publicly posted transparency reports to include, for child sexual exploitation enforcement, retroactive to January 1, 2020 and continuing quarterly:

a. Account-level enforcement actions disaggregated by race, age bracket, and gender

b. NCMEC CyberTipline reports filed, disaggregated by race

c. Comparison rates between enforcement actions and CyberTipline reports, and between permanent disablements and CyberTipline reports, by race

Reporting must consist of aggregate, de-identified data only. No CyberTipline contents or user identifiers shall be disclosed. Each report must include a methods appendix explaining data collection and analysis. Meta must update these reports quarterly with a historical backfill to January 1, 2020.

180.    *Identity-Neutral Review for Safety Enforcement:* For safety enforcement including CSE, Meta must implement masking of identity-revealing imagery—including profile photos, avatars, and government identification—by default at every human review stage unless identity verification constitutes the specific task at that step.

A reviewer who has viewed unmasked identity information in any non-identity-verification step cannot serve as the final decision-maker for that account.

181.    *Remedial Notice to CSE-Disabled Account Holders:* Within 120 days, Meta must send a neutral, factual notice to each user with prior account-administration rights over any account permanently disabled under the CSE policy from January 1, 2020 to present. Thereafter, Meta must send such notice within 14 days of any new CSE permanent disablement. The notice must include:

    a.  Clarification that the CSE enforcement constitutes a platform policy determination rather than a legal finding or criminal accusation

    b.  Disclosure of whether a CyberTipline report was filed for the account and, if filed, the date of filing

    c.  Instructions for requesting a machine-readable export of non-excepted account data and obtaining a manifest of withheld content

    d.  Reference to Meta's enhanced transparency reporting and methodology documentation

182.    *Audit Log Retention:* Meta must maintain for five years audit logs sufficient to show for any human review:

    a.  Timestamp of review

    b.  Reviewer role designation

    c.  Whether identity-revealing imagery was displayed

    d.  Written rationale if masking was lifted

183.    *Bias-Mitigation Training and Public Reporting:* Meta must conduct annual training for reviewers and supervisors on avoiding reliance on protected characteristics. Meta must publish annual public summaries including:

    a.  Training completion rates

    b.  Curriculum overview

    c.  Exception-use rate trends Individual employee information shall not be disclosed.

184. *Aggregate Disparity Analysis:* Twice yearly for five years from judgment, Meta must publish aggregate summaries of:

    a. Enforcement outcomes including review affirmations versus restorations

    b. Exception-use rates for identity masking

    c. Disparities by protected class using existing data and lawful proxies

No party shall be required to collect new sensitive data solely for compliance. Each report must include methodology notes.

**Orders Against Accenture LLP:**

*Final Review Transparency Statement:* Within 60 days, Accenture must publish on Accenture's website a statement describing:

    a. Accenture's role in Meta's final human review for policy enforcement during 2020-2025;

    b. Whether reviewers could view users' profile photos and government identification images during review;

    c. Bias-mitigation training in place during that period

185. *Quarterly Metrics:* Publish quarterly:

    a. Total final reviews performed for Meta in safety policy enforcement categories

    b. Percentage of final reviews in which identity-revealing imagery was displayed

    c. Comparative affirmation rates when such imagery was visible versus masked

186. *Implementation of Identity-Neutral Review Protocols:* When performing final review or other human review services for Meta's safety enforcement, Accenture must implement identical protocols:

    a. Masking by default

    b. Separation of functions

    c. Two-key exception system

    d. Logging and retention requirements as described above

FIRST AMENDED COMPLAINT FOR DECLARATORY AND PUBLIC INJUNCTIVE RELIEF

Accenture must bind all partners and subcontractors performing substantially similar functions to these requirements through contractual obligations.

187.    *Reviewer Training and Aggregate Reporting:* Accenture must conduct annual bias-mitigation training for reviewers and supervisors. Accenture must publish annual public summaries showing:

a.    Training completion rates and exception-use rate trends

## VI.  JURY TRIAL DEMANDED

188.    Plaintiff demands a jury trial on all issues so triable.[1]

Dated: October 17, 2025                                                          Respectfully submitted,

*/s/ Marvelle J. Ballentine*

MARVELLE J. "JAY" BALLENTINE
Plaintiff, pro se
7862 W. Irlo Bronson Memorial Hwy
#82
Kissimmee, FL 34747
(407) 794-6503
jayballentine@protonmail.com

---

[1] *As a CSA survivor, Plaintiff gratefully acknowledges the unwavering support of his wife, whose steady presence made the psychological recovery, and subsequent preparation of this Complaint possible. He further acknowledges his children, especially his eldest, who endured his distance during the preparation of this filing after once celebrating his NRVTA graduation with pride. This work now returns to them, just as their father and husband does.*

FIRST AMENDED COMPLAINT FOR DECLARATORY AND PUBLIC INJUNCTIVE RELIEF